## UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| **KIANTRÉ BELCHER,** | ) | |
| | ) | |
| **Petitioner,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 18-CV-0018-CVE-JFJ** |
| | ) | |
| **CHRISTE QUICK, Warden,**[1] | ) | |
| | ) | |
| **Respondent.** | ) | |

## <u>OPINION AND ORDER</u>

Kiantré Belcher, an Oklahoma prisoner appearing through counsel, petitions for federal habeas relief, under 28 U.S.C. § 2254, challenging the lawfulness of his custody under the criminal judgment entered against him in Tulsa County District Court Case No. CF-2014-3840 following his convictions as to four counts of armed robbery.  He contends that he is in custody in violation of his Sixth Amendment right to counsel and his Fourteenth Amendment right to due process, because the State of Oklahoma ("the state") did not present sufficient evidence to prove his guilt beyond a reasonable doubt; the prosecutor withheld evidence of leniency deals it made with two testifying codefendants and elicited false testimony from those same codefendants denying that they had leniency deals; trial counsel provided constitutionally deficient representation by failing to investigate his case and present available evidence; and appellate counsel provided constitutionally deficient representation by failing to adequately argue trial counsel's ineffectiveness.

---

[1] Pursuant to Federal Rule of Civil Procedure 25(d) and Rule 2(a), <u>Rules Governing Section 2254 Cases in the United States District Courts</u>, the Court substitutes Christe Quick, Warden, in place of Kelli Davis, Warden, as party respondent.  The Clerk of Court shall note on the record this substitution.

The Court has carefully considered the amended petition (Dkt. # 41), the response in opposition to the amended petition (Dkt. # 51), and the reply (Dkt. # 52);[2] Belcher's motion for discovery (Dkt. # 42) and motion for hearing (Dkt. # 53), the responses to both motions (Dkt. ## 49, 54), and the reply to the motion for discovery (Dkt. # 50); the record of state court proceedings (Dkt. ## 28, 29, 30); materials that Belcher submitted to support his actual innocence gateway claim (Dkt. ## 41-2 through 41-6, 44, 45, 46, 47, 48); and applicable law. The Court finds and concludes that 28 U.S.C. § 2254(d) bars relief as to Belcher's claim challenging the sufficiency of the evidence; that Belcher procedurally defaulted his remaining constitutional claims; that an evidentiary hearing is not necessary to evaluate Belcher's actual innocence gateway claim; and that Belcher has not shown that he can overcome the procedural default of his constitutional claims. The Court therefore denies the amended petition and denies Belcher's motions for discovery and a hearing.

---

[2] Belcher amended his petition, with leave of Court, after he obtained habeas counsel. In the amended petition, Belcher states that he "incorporates the information, arguments, authorities, and statements contained in [his] original petition." Dkt. # 41, at 7. Ordinarily, "[w]hen a petition is amended by leave of the court, the cause proceeds on the amended petition." Washer v. Bullitt Cnty., 110 U.S. 558, 562 (1884). But Federal Rule of Civil Procedure 10(c) provides that "a statement in a pleading may be adopted by reference elsewhere in the same pleading or in any other pleading or motion." Nonetheless, "[f]or all or part of a prior pleading to be incorporated in a later pleading, the later pleading must specifically identify which portions of the prior pleading are adopted therein." Gen. Acc. Ins. Co. of Am. v. Fid. & Deposit Co. of Md., 598 F. Supp. 1223, 1229 (E.D. Pa. 1984). In other words, "[t]he later pleading must adopt specific portions or all of the earlier pleading 'with a degree of clarity which enables the responding party to ascertain the nature and extent of the incorporation.'" Id. (quoting Heintz & Co. v. Provident Tradesmens Bank & Trust Co., 29 F.R.D. 144, 145 (E.D. Pa. 1961)); accord Ortiz v. New Mexico, 550 F. Supp. 3d 1020, 1078 (D. N.M. 2021) ("[A]doption by reference must be sufficiently direct and explicit for an opposing party to have fair notice of the claims against them."). To the extent the Court can discern which portions of the original petition Belcher intends to incorporate into the amended petition and whether respondent had fair notice that those portions were incorporated, the Court will consider those portions of the original petition in adjudicating the amended petition. See FED. R. CIV. P. 8(e) ("Pleadings must be construed so as to do justice."). However, for all other purposes, the Court declares moot the original petition (Dkt. # 1).

2

I.      **Background**[3]

    A.      **Investigation and charges**

In the summer of 2014, Tulsa Police Detective Maxwell Ryden investigated a series of robberies, including the robbery of a Patricia's Lingerie store on July 14, a Little Caesar's Pizza on July 19, a Tulsa Dollar General on July 21, and a Collinsville Dollar General on July 25. Dkt. # 29-5, Tr. Trial vol. 4, at 110-17 [566-73].[4] After reviewing police reports and surveillance videos, Ryden noticed similarities among the robberies. Each robbery involved: a "high cash volume" business; two masked, gloved robbers with guns—one of whom would stay near the door and one of whom would direct employees to place money from the register and safe into a plastic bag from the business; and an unmasked lookout who entered the store just before the robbery. Id. at 113-14 [569-70]. In the surveillance videos from both Dollar General stores, Ryden saw that the robber who retrieved the money wore a black mask and a black hoodie with lighter-colored stitching on the back near the neckline and that the robber who stood closer to the door wore a white mask and white gloves. Id. at 153-56 [609-12]. In the surveillance video from the Little Caesar's, Ryden saw that one robber wore what appeared to be the same black hoodie with lighter-colored stitching on the back near the neckline. Id. Based on his investigation, Ryden suspected that all four robberies were connected. Id. at 113-15 [569-71].

---

[3] Because Belcher challenges the sufficiency of the evidence and presents an actual innocence gateway claim, the Court provides a thorough discussion of the evidence presented at trial.

[4] The Court's citations generally refer to the CM/ECF header pagination. Citations to transcripts of state court proceedings (e.g., "Tr. Trial") or the original state court record ("O.R."), also include, in brackets, the original page numbers if those numbers differ from the CM/ECF header pagination.

With the help of other officers, Ryden identified the lookout from the Collinsville Dollar General surveillance video as Jarrelle Wesson. Id. at 117-22 [573-78]. On August 5, 2014, Ryden separately interviewed Wesson and Armad Gix, the latter of whom Wesson identified as the lookout depicted in a still photo taken from the Tulsa Dollar General surveillance video. Id. at 122-25 [578-81]. Both men initially denied involvement in any robberies. Id. Ultimately, however, Wesson and Gix implicated themselves, Belcher, and Gregory Carter in all four robberies. Id. at 126-34 [582-90], 146-53 [602-09]. In November 2014, the state filed an amended information charging Belcher, Carter, Wesson, and Gix with all four armed robberies. Dkt. # 29-10, O.R. vol. 1, part 2, at 15-25 [87-97].[5]

## B.    Jury trial

Belcher and Carter were tried jointly in September 2015; Wesson and Gix waived their rights to a jury trial and testified at the joint trial. Dkt. # 29-9, O.R. vol. 1, part 1, at 22-23 [18-19]. The following facts were developed at trial.

### 1.    Patricia's Lingerie

Allysha Coble was working at the Patricia's Lingerie near 11th and Garnett in Tulsa, around midnight on July 14, 2014, when a man with a handgun and a bandana over his face came through the front door. Dkt. # 29-4, Tr. Trial vol. 3, at 24-27 [253-56]. The man told four customers in the store—two black men and two black women—to get down on the floor. Id. The man forced Coble to walk behind the counter by threatening her and pointing his gun at the back of her neck, took the money that was in the register, went to the back of the store and retrieved a

---

[5] The amended information also charged all four men with an armed robbery of a Kwik Stop on July 26, 2014, and charged Carter, alone, with three additional robberies. Dkt. # 29-10, O.R. vol. 1, part 2, at 15-25 [87-97]. At the State's request, the trial court dismissed these four charges at the preliminary hearing. Dkt. # 29-1, Tr. Prelim. Hr'g, at 3; Dkt. # 29-2, Tr. Trial vol. 1, at 4-5.

cash box, and left the store with roughly a thousand dollars.  Id. at 25-26 [254-55], 31 [260].  After

the man left, Coble reported the robbery to the police.  Id. at 27-28 [256-57].  Coble described the

man as a black man wearing a black hoodie, long jean shorts, and white tennis shoes.  Id. at 26

[255], 29-30 [258-59].  Coble testified that she did not see much of the man's face, did not

remember the faces of the four customers, and likely would not recognize the man or the customers

if she saw them again.  Id. at 28 [257].  Coble also testified that the business had no surveillance

video of the robbery.  Id. at 29 [258].  Tulsa police officer Mark Goben responded to the robbery

call, obtained a limited description of the suspect from Coble, did not locate a suspect, and did not

recover any evidence that would help identify the suspect.  Id. at 33-38 [262-67].

    Wesson testified that he went to Patricia's Lingerie on July 14 with Belcher, Carter, Gix,

and two women whom Wesson did not know.  Dkt. # 29-4, Tr. Trial vol. 3, at 134 [363], 164 [393].

Wesson and the women rode with Belcher, who was driving an Impala, and Carter rode with Gix,

who was driving Gix's Chevy Traverse.  Id. at 134-35 [363-64].  Wesson and Belcher

communicated by phone with Gix and Carter and the men planned the robbery before or during

the drive to Patricia's Lingerie, so Wesson "knew what was supposed to go on."  Id. at 136 [365],

166-67 [396-97].  Belcher parked the Impala near the front door of Patricia's Lingerie.  Id. at 135

[364], 165 [394].  Belcher, Wesson, and the two women went inside and "were just looking

around."  Id. at 135 [364], 203 [432].  One woman communicated by phone with Carter and Gix.

Id. at 167 [396], 203-04 [432-33].  Wesson saw Carter enter the store with a gun; Carter then "put

the gun at the [store employee] and told her to give him the money."  Id. at 136-37 [365-66].

Belcher, Wesson, and the women left the store ten to fifteen minutes after Carter left the store.  Id.

at 137 [366], 165 [394].  They picked up Carter, who was walking down the street after the robbery

because "Gix left him."  Id. at 137-38 [366-67], 168 [397].  After the robbery, Wesson, Belcher,

and Carter went to the Worthington apartments, where Wesson lived with Sharonda Goree, his godsister. Id. at 133 [362], 138-39 [367-68], 163 [392], 168-69 [397-98]. The men entered Goree's apartment and walked upstairs, and Carter divided up the money. Id. Wesson testified that Goree was home, but she did not know what the men "were up to." Id. at 138 [367].

Gix testified that he drove his Chevy Traverse to the hotel next to Patricia's Lingerie on July 14, that Carter was his passenger, and that it was Carter's decision to rob Patricia's Lingerie. Dkt. # 29-5, Tr. Trial vol. 4, at 6-7 [462-63], 45-47 [501-03]. Gix testified that Belcher and Wesson drove to Patricia's in "a dark-colored . . . four-door car," and that two women were with Belcher and Wesson. Id. at 8-9 [464-65]. Gix testified that the plan was for Belcher, Wesson, and the women to go in first and tell Carter when it was "okay to come in." Id. at 9-10 [465-66]. Gix and Carter communicated by phone with Wesson, and Wesson told them when it was okay for Carter to go inside. Id. at 11-12 [467-68], 49-50 [505-06]. Carter told Gix to park across the street, Carter got out of Gix's car, and Gix parked across the street. Id. at 10 [466], 50-52 [506-08], 82-84 [538-40]. Gix was the getaway driver, but the plan "got mixed up" and Carter did not return to Gix's car. Id. at 10 [466]. Wesson called Gix and told Gix that Belcher picked up Carter, Gix drove to the hotel parking lot, and Carter got into Gix's car. Id. at 11-12 [467-68], 52-53 [508-09], 85-87 [541-43]. Gix testified that all four men went to Goree's apartment, and Carter split up the money. Id. at 12-13 [468-69], 89 [545].

### 2.    Little Caesar's Pizza

Sevelia Rosales was working at the Little Caesar's Pizza near Pine and Harvard in Tulsa, around 9:00 p.m. on July 19, 2014, when two men wearing facial coverings and gloves "came running inside the store with guns," and one of the men demanded money. Dkt. # 29-4, Tr. Trial vol. 3, at 39-41 [268-70]. One man took money from the cash registers and the safe. Id. at 41-42

6

[270-71].  Rosales described that man as "wearing all black, [a] black long-sleeved shirt and black pants, real tall, [and] thin," and maybe "around six feet," and she testified that when he "stuck [his] hand in the safe" his shirt sleeve moved up and she could see that he was black.  Id. at 42-46 [271-75].  Rosales primarily focused on the man pointing a gun at her and described that man as "the tallest one" in "all black" who "came to the cash registers" and grabbed money from the safe.  Id. at 47-48 [276-77].[6]  Rosales heard one of the men say, "it's taking too long," and both men "started running outside."  Id. at 42-43 [271-72].  After the men left, Rosales called the police to report the robbery, and she gave responding officers the surveillance video from the store.  Id. at 43 [272].

Rosales identified State's Exhibit 1 as the surveillance video from the Little Caesar's robbery, and the video was published for the jury.  Id. at 43-44 [272-73].  That video shows that two armed men entered the store.  Dkt. # 30 (State's Ex. 1).  One man wore a gray, long-sleeved shirt, dark pants, a red bandana covering most of his face, and a gray and red baseball cap.  Id.  The other man wore black pants, a black hoodie with lighter-colored stitching on the back near the neckline, and a black face covering.  Id.  Both men had handguns.  Id.  The man with the red bandana pointed his gun at several customers and motioned for them to stand in the corner of the store.  Id.  The man dressed in black went directly behind the counter to the registers and safe and, at some point, also walked to and from the back of the store.  Id.  For a few minutes, both men

---

[6] Belcher's counsel began her cross-examination of Rosales by suggesting that Rosales "said that the two gentlemen were tall and thin."  Dkt. # 29-4, Tr. Trial vol. 3, at 45 [274].  But on direct and cross-examination, Rosales testified that the man "wearing all black" was tall and thin, id. at 42 [271], that she thought "one was about around six feet," id. at 45 [274], and that she mainly paid attention to "the tallest one" whom she described as the man dressed in all black, id. at 47 [276].  In any event, Rosales description of the men who entered Little Caesar's neither hurts nor helps Belcher.  As further discussed below, Wesson and Gix both testified that Belcher did not enter this store at all during the robbery and, instead, dropped off the two men who robbed the store and drove away before the robbery.

were behind the counter grabbing money, and the man with the red bandana appeared to stuff money into his pockets.  Id.

Tulsa police officer Wesley Anderson responded to the robbery call and obtained witness statements describing the robbers as two black men, one with a hoodie tied to cover his face and one with a handkerchief covering his face.  Dkt. # 29-4, Tr. Trial vol. 3, at 50-53 [279-82].  Witnesses told Anderson that the men left the store traveling east.  Id.  Anderson testified that he did not request any fingerprint testing because the surveillance video showed that one man wore gloves.  Id.

Wesson testified that Belcher drove his gray Trailblazer to the Little Caesar's, dropped off Carter and "another person," and left before the robbery.  Id. at 139-41 [368-70], 169 [398].  Wesson later testified, under protest, that the person with Carter and Belcher was Wesson's godbrother, Cody Cummisky.[7]  Id. at 208-12 [437-41], 215-16 [444-45], 222-25 [451-54].  Wesson testified that he went to the Little Caesar's with Gix, in Gix's car, and Gix parked down the street from the Little Caesar's.  Id. at 140-41 [369-70].  Wesson testified that the plan was for Carter and Cummisky to rob the store and to leave in Gix's car with Gix and Wesson.[8]  Id.  Wesson testified that, after the robbery, Carter and Cummisky got into Gix's car, Carter was dressed in all black

---

[7] As Belcher notes, the trial transcripts have various spellings of Cummisky's name.  Dkt. # 42, at 5 n.1.  The Court adopts Cummisky as the correct spelling based on Belcher's reference to Tulsa County District Court Case No. CF-2011-3033, a case in which the state charged Wesson and Cummisky with robbery.  Id.

[8] Wesson also testified that there was no plan and that he went to Little Caesar's only "because [he] was worried about [his] family."  Dkt. # 29-4, Tr. Trial vol. 3, at 209-10 [438-39], 213 [442].  It is clear from the trial transcripts that Wesson attempted throughout his testimony to minimize his involvement in the robberies, and he suggested more than once that he participated in the robberies out of fear.  In contrast, Gix testified that all four defendants were "willing participants" in the robberies.  Dkt. # 29-5, Tr. Trial vol. 4, at 91 [547].  Regardless of what motivated Wesson to participate in the robberies, he ultimately pleaded guilty as charged.

and had a black mask, and Gix drove the men to the Worthington apartments. Id. at 140-41 [369-70], 145 [374]. Wesson testified, confusingly, that Carter divided up some money while the men were in Gix's car; that Carter may have divided up more money after they went into Goree's apartment; that "everybody" got a share of the money; that Wesson did not get any money; that Belcher may not have received any money; and that Belcher showed up at Goree's apartment sometime after Carter divided the money. Id. at 140-42 [369-71], 172-75 [401-04].

Gix testified that Carter, Belcher, and "a third party" drove to Little Caesar's in Belcher's Trailblazer, with Belcher driving. Dkt. # 29-5, Tr. Trial vol. 4, at 14-15 [470-71], 93 [549]. Gix testified that he did not recall whether the "third party" was Cummisky. Id. at 15 [471], 55-56 [511-12], 95 [551]. Gix and Wesson drove separately, with Gix driving his Chevy Traverse and following Belcher's Trailblazer. Id. at 15-16 [471-72], 93-94 [549-50]. Gix parked on the side street, as Carter had directed him to do, and Gix did not see who went into or came out of the Little Caesar's. Id. at 16-17 [471-72], 57-60 [513-16]. Gix knew that the plan was to rob Little Caesar's, and he drove off after Carter ran to the car. Id. at 16-17 [471-72], 62 [518]. Gix initially testified that he did not remember whether anyone else got into his car with Carter, but he later admitted that he, Wesson, and two others were in his car after the robbery. Id. at 16-17 [471-72], 99 [555]. Gix testified that Carter was wearing dark clothes, specifically, a "dark hoodie," and had a gun. Id. at 17-18 [473-74]. Gix drove to the Worthington apartments, and the money was divided among Gix, Carter, Belcher, Wesson, and "the fifth person." Id. at 18-19 [474-75], 62 [518], 97-99 [553-55].

### 3. Tulsa Dollar General

Jenna Capron was working at the Dollar General near Admiral and Memorial in Tulsa, around 9:00 p.m. on July 21, 2014, when "some people came in and put some guns in [her] face

9

and robbed [her]." Dkt. # 29-4, Tr. Trial vol. 3, at 55-56 [284-85].  Capron was standing behind

the register when "two guys came in." Id. at 56 [285].  One man came behind the register and the

other man "stayed in front where the bags are." Id.  Both men put guns in her face and told her to

put money in a plastic bag from the store. Id.  Capron put "maybe a little over $200" from the

register into the bag. Id. at 57 [286].  The men walked to the safe, Capron's co-worker opened the

top of the safe, and the men "only got the change" from the safe but "didn't get any of the big

money." Id.  After they got the money from the safe, the men "ran out." Id.  Capron testified that

there were customers in the store, that the robbery was captured on surveillance video, and that

someone called the police after the men left the store. Id.  On cross-examination, Capron testified

that one man who entered the store was wearing a white bandana over his face and white gloves.

Id. at 59-60 [288-89].  Capron remembered hearing one man say, "don't move," and she did not

move until "the other one came behind the counter and told [her] to put money in the bag." Id. at

60 [289].  Capron described the man behind the counter as wearing a black mask and black gloves.

Id.  She did not remember anything unusual or odd about either man, other than the fact that they

were robbing the store. Id. at 60-61 [289-90].[9]

Capron identified State's Exhibit 2 as the surveillance video from the Tulsa Dollar General

robbery, and the video was published to the jury. Id. at 58-59 [287-88].  Capron identified herself

as the person in the surveillance video who was "behind the counter wearing the capris." Id.  The

video shows that several customers were in the store before the robbery.  Dkt. # 30, (State's Ex.

---

[9] At trial, Goree identified Belcher as wearing an eye patch and testified that he "always" wore sunglasses; Gix testified that Belcher had a problem with one eye and "typically" wore sunglasses, even at night; and Ryden testified that Belcher had a "messed-up eye." Dkt. # 29-4, Tr. Trial vol. 3, at 83 [312], 99-100 [328-29]; Dkt. # 29-5, Tr. Trial vol. 4, at 100-01 [556-57], 166-67 [622-23].  Belcher's attorney emphasized in closing argument that no eyewitnesses described any robber as having any distinctive features or wearing sunglasses. Dkt. # 29-6, Tr. Trial vol. 5, at 21-22 [694-95].

2).[10]  A few minutes before the robbery, a black male wearing a white tank top and long camo shorts walked into the store.  Id.  The man appeared to be talking on his phone and looking around the store.  Id.  At some point, two men with handguns entered the store.  Id.  Both men were dressed in black, one man wore a white mask with small openings around the eyes and white gloves, and one man wore a black mask and black gloves.  Id.  The man in the white mask and gloves pointed his gun at several customers and stayed near the door for the duration of the robbery.  Id.  At one point, he opened the door and allowed two young children to leave the store.  Id.  The man in the black mask and gloves, who was wearing a black hoodie with lighter-colored stitching on the back near the neckline, walked to the cash registers and safe and directed two store employees to put money in a plastic bag from the store.  Id.

Angela Coronado was sweeping the chip aisle of the Tulsa Dollar General when she "heard a commotion" and saw "two masked guys telling everybody to . . . get on the ground."  Dkt. # 29-4, Tr. Trial vol. 3, at 63 [292].  She saw a customer standing in front of her, saw that he was on the phone, and "lipped to him, please call 9-1-1."  Id.  Coronado described the customer as a "stocky black bald guy wearing camo shorts and a white T-shirt" and testified that this same customer "had previously been in [the store] two or three nights" before the robbery.  Id. at 63-64 [292-93], 66 [295].  One of the robbers looked at Coronado, so she walked to the front of the store with her hands up, got money out of the safe, and gave him the money.  Id. at 64 [293].  Coronado testified that she could tell "[b]y their voice, their tone and their build," that the robbers were "tall, lanky,

---

[10] The disc for State's Exhibit 2 includes videos from twelve different cameras.  Dkt. # 30 (State's Ex. 2).  The videos identified as "Cam 1" or "ch01" and "Cam 2" or "ch02" provide the best view of the front door, the cash registers, the safe, and the robbers.  The man in camo shorts, identified at trial as Gix, is seen entering and looking around the store in these two videos and in other videos.  Several of the videos provide no view of the robbery.  It is not clear from the trial transcript exactly which videos or portions of videos the jury viewed, but the Court has viewed all videos.

[and] African American." Id. at 64-65 [293-94], 67 [296].  She testified on cross-examination that she could not see the "skin tone" of the robbers and that she did not look into the eyes of either robber, both of whom had their faces "covered with masks."  Id. at 67-69 [296-98].  According to Coronado, the men "just took all the bills," took no change, and likely got five or six hundred dollars.  Id. at 65 [294].  Coronado testified that she gave the surveillance video to the police.  Id.

Tulsa police officer Jamie Wofford responded to the Tulsa Dollar General robbery.  Id. at 74-76 [303-05].  Wofford ascertained from witnesses that the suspects were young black men, that they wore masks and gloves, and that the robbery was captured on surveillance video.  Id. at 76-80 [305-09].  Wofford testified that responding officers did not request DNA or fingerprint testing because the robbers wore gloves.  Id.

Wesson testified that he, Belcher, Carter, and Gix drove to the Tulsa Dollar General in two separate vehicles and that the men may have planned the robbery at Goree's apartment.  Dkt. # 29-4, Trial vol. 3, at 142-44 [371-73], 216-17 [445-46].  Gix drove by himself in his Traverse, and Wesson and Carter rode with Belcher in Belcher's Trailblazer.  Id.  Gix went inside the store as the lookout and "scoped it out," while communicating with Wesson, Belcher, and Carter by phone. Id. at 142-44 [371-73], 176 [405].  At some point, Carter and Belcher—both of whom were dressed in all black—went into the store, and Wesson moved to the front seat of Belcher's Trailblazer.  Id. at 142-44 [371-73], 217 [446].  Wesson testified that Belcher wore a white mask, and Carter wore a black mask.  Id. at 142-44 [371-73], 175 [404].  Wesson also testified that Belcher and Carter "would get dressed while [all the men] were in the car," and that Belcher and Carter kept their outfits, masks, and gloves in "a duffel bag."  Id. at 145-46 [374-75], 176 [405], 217 [446].  When Belcher and Carter returned to the vehicle, Wesson drove away from the store, all four men met

up at Gix's house, near 11th and Memorial, and Carter divided up the money.  Id. at 146-47 [375-76], 177-79 [406-08].[11]

Gix testified that he drove his Chevy Traverse to the Tulsa Dollar General on July 21 to act as a lookout.  Dkt. # 29-5, Tr. Trial vol. 4, at 20 [476].  Belcher, Wesson, and Carter drove to the store together, with Wesson driving Belcher's Trailblazer.  Id. at 21-22 [477-78], 102-03 [558-59].  Gix identified Belcher's Trailblazer as the gray or silver vehicle depicted in the photo admitted as State's Exhibit 9.  Id.; see Dkt. # 29-7, at 10 (State's Ex. 9).  Gix testified that he went into the store, talking on his phone with Wesson, and planned to say "do you want any Doritos" if it was okay to enter the store.  Dkt. # 29-5, Tr. Trial vol. 4, at 21-24 [477-80].  Gix identified himself as the man on the phone who was depicted in State's Exhibit 8, a still photo from the Tulsa Dollar General surveillance video.  Id. at 23 [479]; Dkt. # 29-7, at 9 (State's Ex. 8).  At some point, Gix gave Wesson the signal to come in.  Dkt. # 29-5, Tr. Trial vol. 4, at 24 [480], 63-64 [519-20].  Gix was inside the store when he "saw Carter go to the counter and Belcher watch the door."  Id.  Both men were dressed "[i]n dark attire," "Belcher had a white bandana or rag[,] and Carter had on a black mask."  Id.  Gix knew which man wore which mask because he helped plan the robbery and knew "who was going to watch the door and who was going to get the money."  Id. at 24-25 [480-81], 64 [520].  Gix saw Carter go behind the register to get the money and heard Belcher say, "don't move, don't nobody move."  Id. at 25-26 [481-82].  The store manager walked past Gix,

---

[11] Although Wesson initially described the second vehicle used in the Tulsa Dollar General robbery as Belcher's Trailblazer, Wesson testified on cross-examination that Belcher and Carter came out of the store and got into "[t]he Jeep," and that Wesson drove the Jeep to Gix's house. Dkt. # 29-4, Tr. Trial vol. 3, at 218-19 [447-48].  On the recording of a store employee's 911 call, a recording that apparently was not admitted at trial, witnesses described the getaway vehicle as a maroon or burgundy SUV.  Dkt. # 30, (State's Ex. 10); see also Dkt. # 29-10, O.R. vol. 1, part 2, at 1 [73] (probable cause affidavit, dated August 6, 2014, identifying suspect vehicle as "maroon SUV").  State's Exhibit 9, identified at trial as a photo of Belcher's Trailblazer, depicts a silver or gray SUV.  Dkt. # 29-7, at 10 (State's Ex. 9).

saw that he was on his phone, and asked him to call 911.  Id. at 56 [482].  Gix testified that he

called 911 "to make it look like [he] wasn't part of the robbery."  Id.  He identified State's Exhibit

10 as a recording of the 911 call he made during the robbery, and the jury listened to the recording.

Id. at 26-28 [482-84]; Dkt. #30 (State's Ex. 10).[12]  After Carter and Belcher left the store, Gix

stayed behind for a few minutes, but he did not stay long enough to give a statement to the police.

Dkt. # 29-5, Tr. Trial vol. 4, at 29 [485].  Gix drove his Traverse back to his apartment, where he

saw Belcher, Wesson, and Carter sitting in Belcher's vehicle.  Id. at 29-30 [485-86], 65-67 [521-

23].  Carter divided the money among the four men.  Id.

### 4.    Collinsville Dollar General

Alysa Gassaway was working at the Dollar General near Highway 169 in Collinsville,

around 9:00 or 10:00 p.m. on July 25, 2014, when the store was robbed.  Dkt. # 29-4, Tr. Trial vol.

3, at 106-07 [335-36].  Gassaway and her co-worker were preparing to close the store when "a

gentleman came in and asked [them] where the rest room was."  Id. at 108 [337].  Gassaway had

her back to the door and was getting the money drawers ready for close when she "heard someone

tell [them] to get down."  Id.  Gassaway turned around and saw "people . . . dressed in like a

hoodie or a zip-up jacket with pants," and saw that "[t]hey had gloves, guns, and their face was

covered."  Id. at 109 [338].  Gassaway "could tell they were male just by their voice and their

bigger stature" and could see that they had "black" or "darker skin" because "the only thing that

was not covered was like probably like part of the forehead and their eyes."  Id.  Gassaway and

her co-worker "got down," and one man directed them to give them money from the money drawer.

---

[12] The disc of State's Exhibit 10 includes recordings of two 911 calls:  Gix's call and a call
made by a store employee.  Dkt. # 30 (State's Ex. 10).  It appears from the trial transcript that only
the recording of Gix's call was admitted and published to the jury.  Dkt. # 29-5, Tr. Trial vol. 4, at
28-29 [483-84].

Id. at 110 [339].  Gassaway opened the safe while her co-worker gave the man the money from the drawer.  Id.  One man started getting money from the safe himself and put the money in a plastic bag from the store.  Id. at 110 [339], 117 [346].  Gassaway estimated that the men obtained "between two and three thousand" dollars."  Id. at 111 [340].  The men asked if there was another safe, one man said, "we need to hurry," and the men "ran out the door."  Id.  Gassaway saw a car pulling away from the door, but she did not know if the robbers were in that car.  Id.  Gassaway reported the robbery to the police and provided them a copy of the store's surveillance video.  Id. at 111-13 [340-42].  Gassaway identified State's Exhibit 3 as the surveillance video, and portions of the video were published to the jury.  Id. at 113-15 [342-44].[13]  Gassaway testified that police officers recovered "[m]aybe a hundred dollars or so just in loose change" that had been dropped on the street east of the store.  Id. at 115 [344], 117 [346].  On cross-examination, Gassaway testified she saw nothing unusual on the forehead or eye area of either man.  Id. at 116 [345].

Collinsville police officer Joshua Ray responded to the robbery call and spoke with witnesses.  Id. at 118-20 [347-49].  Ray recovered $141 in change that was found on the street east of the store and he obtained a copy of the surveillance video.  Id. at 120-21 [349-50], 123 [352].  Ray testified that witnesses described the suspects as "two black males approximately six feet tall" and that this information was consistent with what he saw on the video.  Id. at 121 [350].

Wesson testified that he, Carter, Belcher, and Gix were "just driving around," in Gix's Traverse, and ended up at the Collinsville Dollar General.  Dkt. # 29-4, Tr. Trial vol. 3, at 147-49 [377-78], 180 [409].  Wesson "went in and looked around to see if anybody was in there."  Id. at 148 [377].  As he was "[c]asing the joint," he saw two store employees  Id. at 148 [377].  Wesson

---

[13] Respondent submitted State's Exhibit 3 as part of the state court record, but the Court could not view the series of videos on the disc because the copy submitted displayed an error message indicating that the file index was broken or missing.  Dkt. # 30 (State's Exhibit 3).

communicated by phone with Carter and Belcher.  Id.  Wesson identified himself as the man depicted in three still photos, admitted as State's Exhibit 4, who was wearing a blue ball cap and a white T-shirt, and the photos were published to the jury.  Id. at 149-50 [378-79], 179 [408]; Dkt. # 29-7, at 5 (State's Ex. 4).  Wesson bought some Cheez-Its and returned to Gix's car, which was parked on the side of the store.  Dkt. # 29-4, Tr. Trial vol. 3, at 150 [379], 179 [408].  After Wesson returned to the car, Belcher and Carter went into the store.  Id. at 151 [380].  Both men were dressed in black, Belcher wore a white mask, and Carter wore a black mask.  Id.  While Belcher and Carter were in the store, Gix moved his car because "a car pulled up on" them.  Id. at 151 [380], 181 [410].  When Gix drove by the front of the store, Wesson saw Belcher near the door.  Id. at 151-52 [380-81], 181-82 [410-11].  At some point, Belcher and Carter "ran to the car" and dropped some money on the ground.  Id.  Gix drove all four men back to Goree's apartment and the men divided up the money.  Id. at 152-53 [381-82].  Wesson testified that Goree was not home, but Wesson had a key to her apartment.  Id.

Gix testified that he, Carter, Belcher, and Wesson, with Gix driving his Chevy Traverse, drove around looking for "something to rob," and ended up in Collinsville.  Dkt. # 29-5, Tr. Trial vol. 4, at 30-32 [486-88], 68-70 [524-26], 105 [561].  Gix drove by a Dollar General, and the men decided to rob the store.  Id.  Wesson went into the store first, alone, then came back out to tell the men it was okay to go inside.  Id. at 32 [488], 70-71 [526-27].  Gix testified that Wesson communicated by phone with the other men "the whole time he was in the store," and Gix heard through the phone that Wesson "asked the ladies where the rest room was."  Id. at 79-80 [535-36].  Gix was parked on the side of the store.  Id. at 32-33 [488-89].  After Wesson returned to the car, Belcher and Carter got out.  Id.  At some point, another car pulled up, so Gix drove around the block, or "in a circle," and again parked beside the store.  Id. at 32-34 [488-90], 71-73 [527-29],

16

106-07 [562-63].  As he drove by the front of the store, Gix saw Belcher near the door; he knew it

was Belcher because Belcher "was the one that was told to watch the door."  Id. at 33 [489].  After

Gix parked beside the store the second time, Carter and Belcher returned to Gix's car and Gix

drove off.  Id. at 34 [490].  Gix drove back to the Worthington apartments, and Carter divided the

money four ways.  Id.  at 34 [490], 73 [529], 103 [563].  Gix testified that Belcher and Carter both

had handguns.  Id. at 35-36 [491-92].  Gix also testified that owned a .40 caliber handgun that he

kept in his vehicle, but he did not use his gun for any of the robberies.  Id. at 37-39 [493-95].

### 5. Other testimony

Sharonda Goree testified that she knew all four defendants.  She met Carter at a club and

had a brief sexual relationship with him in June 2014.  Dkt. # 29-4, Tr. Trial vol. 3, at 80-81 [309-

10], 101-02 [330-31].  Goree described Belcher as her "play brother" and testified that she "met

him at a nightclub dancing" and had known him for about six months before the robberies.  Id. at

82-83 [311-12], 95 [324].  Goree described Wesson as her "play brother" and testified that she had

known Wesson for at least ten years because her mother "adopted him."  Id. at 84 [313], 95 [324].

She met Gix when he was sitting alone at her strip club; he also dated one of her friends, Heather.

Id. at 84-85 [313-14], 95 [324], 101-02 [329-30].  Goree testified that Wesson lived with her at the

Worthington apartments for a few months in the spring and summer of 2014, that all four

defendants had been to her apartment during that time frame, and that she had previously told a

law enforcement officer that all four men "would come and hang out at [her] apartment or in the

parking lot."  Id. at 85-91 [314-20], 103 [322].  Goree denied any knowledge of the men

participating in robberies or dividing up money at her apartment.  Id. at 92 [321].  She also denied

that she ever gave Wesson a key to her apartment.  Id. at 99 [328].  Goree testified that she had

seen Belcher using crutches, but she did not "know exactly when."  Id. at 93 [322].  She denied

that she ever saw him in a boot, cast, or wheelchair.  Id.  Goree also testified that Belcher "had a car wreck so his foot was messed up," that he "always had a crutch," and that he "had a limp."  Id. Goree also testified that Belcher was a good dancer.  Id. at 93-96 [322-25].  On cross-examination, Goree clarified that she met Belcher at a dance club before he had his car accident, and that he developed a limp after the accident.  Id. at 97 [326].  She also recalled visiting Belcher at the hospital when he had the accident and testified that her father told her that Belcher was at the hospital because her father formerly dated Belcher's mother.  Id. at 98 [327].  Goree described Belcher's accident as a "horrible, horrible car wreck."  Id.

Gix testified that Goree neither knew about nor participated in any robberies.  Dkt. # 29-5, Tr. Trial vol. 4, at 13-14 [469-70].  Gix testified that he intended to plead guilty but that he did not have any deal worked out with the prosecutor, that he would have liked to work out a deal, that he had asked the prosecutor for "a number" and received no response, and that he knew nothing about any sentence he might receive in exchange for his guilty plea.  Id. at 39 [495].  Gix testified that he hoped that his testimony would help him "get something" better.  Id. at 40-41 [496-97].  Gix maintained on cross-examination that he had no deal worked out with the prosecutor in exchange for his testimony and that he was testifying with the hope "for something better."  Id. at 44-45 [500-01], 75-76 [531-32].  Gix testified that he did not know anything about Belcher being in a car accident, but he knew "something was wrong with one of [Belcher's] legs" and Belcher went to the hospital and had "crutches and stuff" likely "sometime in July."  Id. at 101-02 [557-58].

Wesson testified that he had no deal worked out with the prosecutor, that the prosecutor had not promised him anything in exchange for his testimony, and that he was testifying to help himself out.  Dkt # 27-4, Tr. Trial vol. 3, at 131-32 [360-61], 159 [388].  Wesson further testified, on direct examination, that Detective Ryden initially let him go without arresting him and that he

18

was arrested and charged after he failed to stay in touch with Ryden.  Id. at 157-58 [386-87].  He

testified on cross-examination that he had a prior conviction for second degree burglary and had

served prison time, but he maintained that he had no deal worked out with the prosecution.  Id. at

159-60 [388-89].  Wesson also testified on cross-examination that he wanted the jury to believe

he was telling the truth because that would help him with his own charges, and he maintained that

he had not "made a deal with anyone."  Id. at 193-95 [422-24].

Detective Ryden testified about his investigation of the four robberies and how he

determined that the robberies were related.  See, supra section I.A.  He also testified about his

initial decision to treat Wesson as a cooperating witness and how Wesson became a defendant

after he stopped cooperating.  Dkt. # 29-5, Tr. Trial vol. 4, at 129-31 [585-87].  Ryden testified

that he and other officers executed a search warrant at the home where Belcher lived with his

mother on August 7, 2014, two days after his first interview with Wesson and two weeks after the

fourth robbery.  Id. at 135-37 [591-93].  The officers found no evidence in the home connecting

Belcher to any of the robberies.  Id.  They did, however, photograph a gray Chevy Trailblazer in

the front yard that matched Wesson's and Gix's description of the vehicle that was used in some

of the robberies.  Id.  Ryden testified that Belcher's mother, who owned the Trailblazer, permitted

officers to search the Trailblazer and that officers found no evidence linking Belcher to the

robberies.  Id. at 173-74 [629-30].  Ryden arrested and interviewed Belcher that same day.  Id. at

137-45 [593-601].[14]  During the interview, Ryden observed that Belcher was wearing a cast and

---

[14] The state admitted Belcher's videotaped interview, as State's Exhibit 100, only for purposes of his Jackson v. Denno hearing.  Dkt. # 29-2, Tr. Trial vol. 1, at 16; Dkt. 30 (State's Ex. 100).  The trial court ruled that Belcher's statements were voluntary and admissible, and portions of the trial transcript indicate that the prosecutor prepared a redacted version for defense counsel, but it appears that the state introduced Belcher's statements at trial only through Detective Ryden's testimony.  Dkt. # 29-5, Tr. Trial vol. 4, at 126 [355], 140-59 [596-615].

using crutches. Id. at 140 [596]. Belcher told Ryden that he had been discharged from the hospital a few hours before his arrest after having surgery and having the cast put on his leg and that he had taken a Percocet for pain. Id. at 140 [596], 145-46 [601-02]. He also told Ryden this was his second cast, that he had a cast put on about one week before his arrest, and that before that he had been wearing an orthopedic boot "off and on." Id. at 140-41 [596-97], 157 [613], 162-63 [617-18]. Belcher maintained, throughout the interview, that he did not participate in any robberies. Id. at 141-45 [597-601]. But he admitted that he knew Wesson, Gix, and Goree; that he was in his Chevy Trailblazer with Wesson one or two days after the Collinsville Dollar General robbery;[15] and that he had spent time at the Worthington apartments and with Goree.[16] Id.

### 6. Verdicts and sentencing

At the conclusion of the trial, the jury found Belcher guilty as to four counts of robbery with a firearm, in violation of OKLA. STAT. tit. 21, § 801. Dkt. # 29-6, Tr. Trial vol. 5, at 63-64 [736-37]. The jury recommended a five-year prison term as to each conviction. Id.; Dkt. # 29-10,

---

[15] The significance of Belcher's admission that he was in his Trailblazer with Wesson and Carter one or two days after the fourth robbery was not further explored at trial because that admission related to a robbery charge that was dismissed before trial. See supra, n.5. A probable cause affidavit, signed by Ryden and dated August 13, 2014, alleged that Wesson, Carter, and Belcher robbed a Kwik Stop on July 26, 2014; that the suspect vehicle, captured on surveillance video, was a light-colored Chevy Blazer; and that Wesson stated that the three men drove to the Kwik Stop in Belcher's Chevy Blazer. Dkt. # 29-10, O.R. vol. 1, part 2, at 6 [78].

[16] Ryden testified that Belcher also admitted during the interview that he knew Carter and that Carter was with Belcher and Wesson, in the Trailblazer, one or two days after the fourth robbery. Dkt. # 29-5, Tr. Trial vol. 4, at 141-43 [597-99]. Carter's attorney objected, citing Bruton v. United States, 391 U.S. 123 (1968), and the trial court sustained the objection but, at the request of Carter's attorney, did not admonish the jury to disregard the testimony. Id.

O.R. vol. 1, part 2, at 86-89 [158-61].  The trial court sentenced him accordingly and ordered that

he serve all terms consecutively.  Dkt. # 29-8, Tr. Sentencing Hr'g, at 2.[17]

### C.    Postconviction proceedings

Belcher filed a direct appeal in the Oklahoma Court of Criminal Appeals ("OCCA"), and

the OCCA affirmed his convictions and sentences in an unpublished summary opinion filed

October 3, 2016, in Case No. F-2015-867.[18]  Dkt. # 28-3.  Belcher did not seek further direct

review by filing a petition for writ of certiorari in the United States Supreme Court.  Dkt. # 1, at 2.

Belcher commenced this federal habeas proceeding by filing his original petition for writ

of habeas corpus on December 28, 2017.  Dkt. # 1.[19]  Belcher identified five grounds for federal

habeas relief, but four claims were unexhausted.  Dkt. # 16, at 3-5 (discussing Belcher's claims

and 28 U.S.C. § 2254(b)(1)(A)'s requirement that state prisoners exhaust available state remedies

as to any claims asserted in a habeas petition).  Respondent moved to dismiss the original petition.

---

[17] The jury also found Carter guilty as to four armed robberies, and Carter likewise received five-year prison terms for each conviction, to be served consecutively.  Dkt. # 29-10, O.R. vol. 1, part 2, at 90-93 [162-65]; Dkt. # 29-8, Tr. Sentencing Hr'g, at 2.  Within days of the jury verdict, Wesson and Gix each pleaded guilty as to four counts of armed robbery, and, in accordance with their plea agreements, each received a ten-year prison term for each count, with all counts to run concurrently and all prison time suspended.  Dkt. # 29-11, O.R. vol. 2, at 64-80 [231-47], 88-106 [255-73].

[18] Carter appealed his conviction separately in Case No. F-2015-868.  Because each defendant raised only a single issue in their separate appeals challenging the sufficiency of the evidence presented at their joint trial, the OCCA consolidated the separate appeals.  Dkt. # 28-3, at 1 n.1; Dkt. # 51, at 2 n.1.

[19] The Clerk of Court received Belcher's original petition on January 4, 2018.  Dkt. # 1.  However, Belcher signed and placed his petition in the prison mail system on December 28, 2017, and the envelope that contained the petition is identified as "legal mail" and postmarked December 29, 2017.  Id. at 25, 27-28.  Applying the prison mailbox rule, the Court deemed the petition filed on December 28, 2017.  See Houston v. Lack, 487 U.S. 266, 270-72 (1998) (holding that pro se prisoner's pleading is deemed filed when given to prison official for mailing, "regardless of when the court itself receives the documents"); Price v. Philpot, 420 F.3d 1158, 1166 (10th Cir. 2005) (describing showings pro se prisoner must make to benefit from prison mailbox rule).

<u>Id.</u>  The Court denied the dismissal motion and granted Belcher's request to stay this habeas proceeding while he exhausted his available state remedies through a first application for postconviction relief that Belcher filed in the Tulsa County District Court ("TCDC") on January 4, 2018.  <u>Id.</u> at 7-10.[20]

The TCDC denied Belcher's application for postconviction relief on November 13, 2018. Dkt. # 28-6.  Belcher timely filed a notice of intent to appeal on December 13, 2018, and the OCCA granted a certificate of appeal, in PC-2019-31, on January 15, 2019.  Dkt. # 28-7; Dkt. # 28-11, at 2.  In an order filed April 12, 2019, the OCCA declined jurisdiction and dismissed Belcher's postconviction appeal, reasoning that Belcher failed to comply with Rule 5.2(c)(2), <u>Rules of the Oklahoma Court of Criminal Appeals,</u> Title 22, Ch. 18, App. (2019), because he filed his petition in error three days beyond the sixty-day filing period.  Dkt. # 28-8, at 1.  The OCCA further stated, "[i]f Petitioner feels he has been denied a post-conviction appeal through no fault of his own, he may seek the appropriate relief with the District Court," and cited the OCCA's procedural rule permitting a petitioner to seek an out of time postconviction appeal.  <u>Id.</u>; <u>see</u> Rule 2.1(E)(3), <u>Rules of the Oklahoma Court of Criminal Appeals,</u> Title 22, Ch. 18, App. (2019).

On July 10, 2019, Belcher filed a written request for a postconviction appeal out of time. Dkt. # 28-9.  The TCDC construed the request as a second application for postconviction relief seeking a recommendation for a postconviction appeal out of time.  Dkt. # 28-11, at 1-2.  The

---

[20] Belcher placed his first application for postconviction relief in the prison's legal mail system on December 28, 2017—the same day he placed the original petition in the prison's legal mail system. Dkt. # 13 at 1-2.  But Oklahoma does not recognize a prison mailbox rule for filings by pro se prisoners.  <u>Burger v. Scott</u>, 317 F.3d 1133, 1140-41 (10th Cir. 2003).  As a result, Belcher's application for postconviction relief was filed on the date the state district court clerk stamped his application as received, January 4, 2018.  <u>See id.</u> at 1140 (explaining that state post-conviction filing is "properly filed" under Oklahoma law as of date "the proper documents were either delivered to or received by the courts, rather than to or by prison officials").

TCDC considered Belcher's allegations and determined that Belcher failed to show that he was denied a postconviction appeal through no fault of his own. Id. at 2-6. The TCDC declined to recommend a postconviction appeal and dismissed the second application for postconviction relief on April 3, 2020. Id.

Belcher later notified the TCDC, in writing, that he had not received a certified copy of the April 3, 2020, order. Dkt. # 28-12, at 1-2. On June 15, 2020, the TCDC found that Belcher's "right to appeal" the April 3, 2020, order "was frustrated by no fault of his own," and issued an order recommending that Belcher be granted an out of time postconviction appeal to obtain review of the TCDC's April 3, 2020, order dismissing his second application for postconviction relief. Id. Based on the TCDC's recommendation, and Belcher's petition for an out of time appeal filed July 13, 2020, the OCCA issued an order, in Case No. PC-2020-467, on January 27, 2021, granting Belcher's request to file a postconviction appeal out of time. Dkt. ## 28-13, 28-14. Belcher timely perfected that postconviction appeal, in Case No. PC-2021-133. Dkt. ## 28-15, 28-16, 28-17. In an order filed September 3, 2021, the OCCA affirmed the TCDC's April 3, 2020, order dismissing Belcher's second application for postconviction relief. Dkt. # 28-17. The OCCA noted that Belcher's briefing addressed the claims he raised in his first application for postconviction relief; that the OCCA's order granted only an out of time postconviction appeal from the April 3, 2020, order dismissing his second application for postconviction relief; and that the TCDC's findings and conclusions supported the dismissal of his second application for postconviction relief. Id. at 3-5.

On Belcher's motion and notification that his state postconviction proceedings had reached an end, the Court lifted the stay and reopened this habeas proceeding in October 2021. Dkt. # 27. As directed by the Court, respondent responded to the original petition on November 17, 2021,

23

and provided the record of state court proceedings.  Dkt. ## 28, 29, 30.  Belcher obtained habeas

counsel in November 2023, and, with leave of Court, filed the amended petition on June 7, 2024.

Dkt. # 37, 41.

## II.    Discussion

Belcher identifies five constitutional claims:[21]  (1) he was denied his Fourteenth

Amendment right to due process because the evidence was not sufficient to prove his guilt beyond

a reasonable doubt (claim two), Dkt. # 41, at 32-35; (2) he was denied his Fourteenth Amendment

right to due process, as interpreted in Brady v. Maryland, 373 U.S. 83 (1963), because the

prosecutor withheld evidence that the state made leniency deals with two testifying co-defendants,

Wesson and Gix (claim three), Dkt. # 41, at 35-42; (3) he was denied his Fourteenth Amendment

right to due process, as interpreted in Napue v. Illinois, 360 U.S. 264 (1959), because the

prosecutor sponsored Wesson's and Gix's false testimony denying that they had leniency deals

with the state (claim four), Dkt. # 41, at 42-44; (4) he was denied his Sixth Amendment right to

counsel, as interpreted in Strickland v. Washington, 466 U.S. 668 (1984), because trial counsel did

not investigate and present available evidence to establish that Belcher did not commit the

robberies (claim five), Dkt. # 41, at 44-56; and (5) he was denied his Sixth Amendment right to

counsel, as interpreted in Evitts v. Lucy, 469 U.S. 387 (1985), because appellate counsel did not

argue that trial counsel was ineffective for not investigating and presenting evidence to establish

that Belcher did not commit the robberies (claim six), Dkt. # 41, at 56-58.  Acknowledging that he

procedurally defaulted all but one of these claims, Belcher asserts that he can overcome the

procedural default because he has presented a credible actual innocence gateway claim (claim

---

[21]  The five constitutional claims are counts two through six.  Count one is his actual
innocence gateway claim to overcome procedural default of claims three through six.  See II. C.
2, infra.

one).[22]  Id. at 21; Dkt. # 51, at 30.  Belcher requests leave to conduct discovery as to three of his constitutional claims.  Dkt. # 42.  He also requests an evidentiary hearing to develop the factual basis of his constitutional claims and to permit this Court to fully evaluate his actual innocence gateway claim.  Dkt. # 53.

Respondent urges the Court to deny the motions for discovery and an evidentiary hearing and to deny the amended petition.  Dkt. ## 49, 51, 54.  In opposing the amended petition, respondent contends:  (1) that 28 U.S.C. § 2254(d) bars relief as to claim two because the OCCA's decision rejecting that claim is not contrary to, or based on an unreasonable application of, clearly established federal law, Dkt. # 51, at 10-30; and (2) that claims three through six are procedurally defaulted and Belcher has not presented a credible actual innocence gateway claim to overcome the procedural default of those claims, id. at 30-58.  Respondent alternatively contends that even if Belcher could overcome the procedural default, claims three through six should be denied on the merits.  Id. at 70.

## A.     Legal principles

A federal court may grant habeas relief to a petitioner in custody pursuant to a state court judgment "only on the ground that [the petitioner] is in custody in violation of the Constitution or laws or treaties of the United States."  28 U.S.C. § 2254(a); see also Wilson v. Corcoran, 562 U.S. 1, 5 (2010) ("[I]t is only noncompliance with *federal* law that renders a State's criminal judgment susceptible to collateral attack in the federal courts.").  But "a state prisoner must exhaust available state remedies before presenting his claim to a federal habeas court."  Davis v Davila, 582 U.S.

---

[22] "When used to overcome procedural issues, 'a claim of "actual innocence" is not itself a constitutional claim, but instead a gateway through which a habeas petitioner must pass to have his otherwise barred constitutional claim considered on the merits.'"  Fontenot v. Crow, 4 F.4th 982, 1029-30 (10th Cir. 2021) (quoting Herrera v. Collins, 506 U.S. 390, 404 (1993)), cert. denied Crow v. Fontenot, 142 S. Ct. 2777 (2022).

521, 527 (2017); see 28 U.S.C. § 2254(b).  The exhaustion requirement is based on principles of comity and gives "state courts one full opportunity to resolve any constitutional issues by invoking one complete round of the State's established appellate review process."  O'Sullivan v. Boerckel, 526 U.S. 838, 844-45 (1999); see Grant v. Royal, 886 F.3d 874, 890-92 (10th Cir. 2018).  A petitioner satisfies the exhaustion requirement by demonstrating that he "fairly presented" his federal claim to the state's highest court, either on direct appeal or in a post-conviction proceeding, in a procedural manner permitting the court to consider the claim on the merits.  Castille v. Peoples, 489 U.S. 346, 351 (1989).

A federal court ordinarily should dismiss an unexhausted federal claim so that the petitioner can pursue available state remedies.  Grant, 886 F.3d at 891-92.  However, if further state court review of the claim would be barred by an adequate and independent state procedural rule, the federal court may treat the claim as exhausted but procedurally defaulted.  Id. at 892 (discussing when federal courts may impose an anticipatory procedural bar and treat a claim as procedurally defaulted).  Under the procedural default doctrine, a court may not review "federal claims that were procedurally defaulted in state court."  Davila, 582 U.S. at 527.  This includes federal claims that the state court denied based on an adequate and independent state procedural rule, and federal claims that a federal court deems procedurally defaulted through application of an anticipatory procedural bar.  Id.; Coleman v. Thompson, 501 U.S. 722, 732 (1991 ("A habeas petitioner who has defaulted his federal claims in state court meets the technical requirements for exhaustion; there are no state remedies any longer 'available' to him."), holding modified on other grounds by Martinez v. Ryan, 566 U.S. 1 (2012).  A petitioner "may overcome the prohibition on reviewing procedurally defaulted claims" only by demonstrating either cause for the procedural default and resulting prejudice or that the federal court's failure to review the claim will result in a fundamental

26

miscarriage of justice.  <u>Davila</u>, 582 U.S. at 527; <u>Coleman</u>, 501 U.S. at 750.  The miscarriage-of-justice exception, "however, is a markedly narrow one, implicated only in 'extraordinary case[s] where a constitutional violation has probably resulted in the conviction of one who is actually innocent.'"  <u>Magar v. Parker</u>, 490 F.3d 816, 820 (10th Cir. 2007) (quoting <u>Phillips v. Ferguson</u>, 182 F.3d 769, 774 (10th Cir. 1999)).

When a petitioner fairly presents a federal claim in state court, and the state court denies that claim on the merits, a federal court may grant habeas relief on that claim only if the petitioner makes a threshold showing that the state court's decision either (1) "was contrary to . . . clearly established Federal law," 28 U.S.C. § 2254(d)(1), (2) "involved an unreasonable application of clearly established Federal law," <u>id.</u>, or (3) "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding," <u>id.</u> § 2254(d)(2).

Even if the petitioner makes the threshold showings necessary either to overcome § 2254(d)'s bar to relief as to claims the state court adjudicated on the merits or to overcome the prohibition against habeas review of procedural defaulted claims, the petitioner is not entitled to federal habeas relief.  Rather, the federal court will review the petitioner's federal claims de novo and, if it finds error, will apply a harmless-error analysis to determine whether habeas relief is warranted.  <u>See</u> <u>Fry v. Pliler</u>, 551 U.S. 112, 121-22 (2007) (explaining that if the federal court finds a constitutional error on de novo review, the court "must assess [its] prejudicial impact . . . under the 'substantial and injurious effect' standard set forth in <u>Brecht [v. Abrahamson</u>, 507 U.S. 619 (1993)], whether or not the state appellate court recognized the error and reviewed it for harmlessness"); <u>Cuesta-Rodriguez v. Carpenter</u>, 916 F.3d 885, 898 (10th Cir. 2019) ("Claims that the state court didn't adjudicate on the merits, we review de novo."); <u>Milton v. Miller</u>, 744 F.3d 660, 670-71 (10th Cir. 2014) (explaining that satisfaction of § 2254(d)'s standards "effectively

removes AEDPA's prohibition on the issuance of a writ" and "requires [a federal habeas court] to review de novo" petitioner's claims).  Under the Brecht standard, a federal court will grant habeas relief only if the court "is in grave doubt as to the harmlessness of an error that affects substantial rights."  O'Neal v. McAninch, 513 U.S. 432, 445 (1995).

### B.    Claim two:  insufficient evidence

In claim two, Belcher contends that the evidence presented at trial was not sufficient to prove his guilt beyond a reasonable doubt.  Dkt. # 41, at 32-35.  The Fourteenth Amendment's Due Process Clause guarantees "that no person shall be made to suffer the onus of a criminal conviction except upon sufficient proof—defined as evidence necessary to convince a trier of fact beyond a reasonable doubt of the existence of every element of the offense."  Jackson v. Virginia, 443 U.S. 307, 316 (1979).  Under Jackson, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."  Id. at 319.  In the context of habeas review, a federal court looks to state law to identify the essential elements of the offense, "but the minimum amount of evidence that the Due Process clause requires to prove the offense is purely a matter of federal law."  Coleman v. Johnson, 566 U.S. 650, 655 (2012) (per curiam).

Belcher presented this claim on direct appeal, asserting that the evidence was not sufficient to prove his guilt beyond a reasonable doubt "because the convictions were based solely on the uncorroborated testimony of accomplices."  Dkt. # 28-3, at 1.  Belcher's claim primarily rested on Oklahoma's "accomplice corroboration rule, but he also cited Jackson to argue that no rational juror could have found him guilty beyond a reasonable doubt.  Dkt. # 28-1, at 18-26.  The OCCA rejected Belcher's claim.  Given the brevity of the OCCA's decision, the Court repeats it verbatim here:

Evidence is sufficient to support a conviction if, viewing the evidence and all reasonable inferences from it in the light most favorable to the State, any rational trier of fact could find the defendant guilty beyond a reasonable doubt. Coddington v. State, 2006 OK CR 34, ¶ 70, 142 P.3d 437, 456; Spuehler v. State, 1985 OK CR 132, ¶ 7, 709 P.2d 202, 203-04. The Court, in Postelle v. State, explained the rules governing the corroboration of accomplice testimony:

> Under Oklahoma law, a conviction cannot rest upon the testimony of an accomplice unless the accomplice's testimony is corroborated by other evidence that tends to connect the defendant with the commission of the offense. 22 O.S. 2001, § 742. Accomplice testimony must be corroborated with evidence that, standing alone, tends to link the defendant to the commission of the crime charged. Pink v. State, 2004 OK CR 37, ¶ 15, 104 P.3d 584, 590. An accomplice's testimony need not be corroborated in all material respects, but requires "at least one material fact of independent evidence which tends to connect the defendant with the commission of the crime." Cummings v. State, 1998 OK CR 45, ¶ 20, 968 P.2d 821, 830. Corroborative evidence is not sufficient if it requires any of the accomplice's testimony to form the link between the defendant and the crime, or if it tends to connect the defendant only with the perpetrators and not the crime itself. Glossip v. State, 2007 OK CR 12, ¶ 42, 157 P.3d 143, 152. The purpose of the accomplice corroboration rule is to ensure that an accused is not falsely implicated by someone equally culpable in order to seek clemency, or for motives of revenge or any other reason. Collier v. State, 1974 OK CR 49, ¶ 7, 520 P.2d 681, 683.

Postelle, 2011 OK CR 30, ¶ 13, 267 P.3d 114, 126. Furthermore, we have held that circumstantial evidence is sufficient to corroborate an accomplice's testimony and that this Court will take the strongest view of the corroborating testimony that the evidence will permit. See Cullison v. State, 1988 OK CR 279, ¶ 9, 765 P.2d 1229, 1231; Pierce v. State, 1982 OK CR 149, ¶ 6, 651 P.2d 707, 709. The jury in this case was properly instructed on the law governing accomplice testimony and the need for such testimony to be corroborated. We agree with the jury that there was sufficient corroboration, though circumstantial, to support Belcher's and Carter's convictions in this case. See Cullison, 1988 OK CR 279, ¶ 9, 765 P.2d at 1231 (slight evidence is sufficient for corroboration). Their convictions may stand.

Dkt. # 28-3, at 2-3.

The parties agree, and the Court finds, that this claim is exhausted and subject to deferential review under § 2254(d) because the OCCA rejected it on the merits. Dkt. # 41, at 32; Dkt. # 51, at 2, 6-10. They disagree, however, as to whether § 2254(d) bars relief. Belcher argues that the

"OCCA's decision constitutes an unreasonable application of [Jackson] because the accomplice's testimony, which couldn't be supported by any other evidence including eyewitness testimony and anything connecting [him] to the robberies, did no[] more than create a suspicion of guilt." Dkt. # 41, at 34. He further argues the state did not meet its burden of proof because: (1) Wesson and Gix had "obvious motives to testify" and portions of their testimony "did not make sense"; (2) no eyewitnesses testified at trial that any robbery suspect had Belcher's "unique identifying characteristics," namely, his "uniquely appearing left eye, and injured right leg and foot"; and (3) "the absence of a gun, a bag full of clothes matching what the robbers were wearing, bags from the stores used to carry the money, or any other physical evidence contradicts Wesson and Gix's testimony." Id. at 34-35. Thus, Belcher asserts, "[t]he weight of the evidence that doesn't suggest [he] participated in the robberies is much greater than the evidence that does." Id. at 35.

Respondent contends that the OCCA applied Jackson in an objectively reasonable manner because "any rational trier of fact could find [Belcher] guilty beyond a reasonable doubt." Dkt. # 51, at 27. Respondent argues that the testimony from Wesson and Gix directly implicated Belcher in the robberies and, standing alone, is sufficient to support his convictions and that this testimony also was corroborated in several respects by circumstantial evidence, including Belcher's interview statements, Goree's testimony, and surveillance videos from three of the robberies. Id. at 14-30.

"Jackson claims face a high bar in federal habeas proceedings because they are subject to two layers of judicial deference." Johnson, 566 U.S. at 651.

> First, on direct appeal, "it is the responsibility of the jury—not the court—to decide what conclusions should be drawn from evidence admitted at trial. A reviewing court may set aside the jury's verdict on the ground of insufficient evidence only if no rational trier of fact could have agreed with the jury." Cavazos v. Smith, 565 U.S. 1, 132 S. Ct. 2, 4, 181 L. Ed. 2d 311 (2011) (per curiam). And second, on habeas review, "a federal court may not overturn a state court decision rejecting a

sufficiency of the evidence challenge simply because the federal court disagrees
with the state court.  The federal court instead may do so only if the state court
decision was 'objectively unreasonable.'"  <u>Ibid.</u> (quoting <u>Renico v. Lett</u>, 559 U.S.
766, 130 S. Ct. 1855, 1862, 176 L. Ed. 2d 678 (2010)).

<u>Johnson</u>, 566 U.S. at 651.  The objective reasonableness standard is demanding.  It requires a

petitioner to "show that the state court's ruling on the claim being presented in federal court was

so lacking in justification that there was an error well understood and comprehended in existing

law beyond any possibility for fairminded disagreement."  <u>Harrington v. Richter</u>, 562 U.S. 86, 103

(2011).  In other words, if it is possible for fairminded jurists to disagree about the determination

as to whether an alleged constitutional error occurred in state court proceedings, § 2254(d) bars

relief.  Congress made it "difficult" to satisfy § 2254(d) because "state courts are the principal

forum for asserting constitutional challenges to state convictions," <u>Richter</u>, 562 U.S. at 102-03,

and "[g]ranting habeas relief to a state prisoner 'intrudes on state sovereignty to a degree matched

by few exercises of federal judicial authority,'" <u>Brown v Davenport</u>, 596 U.S. 118, 132 (2022)

(quoting <u>Richter</u>, 562 U.S. at 132).

To obtain Belcher's convictions, the state had to prove, beyond a reasonable doubt, that he

participated in:  (i) the wrongful taking of property from another; (ii) by force or fear; (iii) through

the use of a dangerous weapon.  <u>See</u> OKLA. STAT. tit. 21, § 801; <u>Primeaux v. State</u>, 88 P.3d 893,

906 (Okla. Crim. App. 2004); Dkt. # 29-11, O.R. vol. 2, at 31 [198], 33-34 [200-01].  Belcher

argues that the state failed to satisfy its burden of proof as to any of these elements, and that the

OCCA's rejection of his <u>Jackson</u> claim thus was objectively unreasonable, because the testimony

of Wesson and Gix was incredible and uncorroborated, no other eyewitnesses identified Belcher

as a robbery suspect, and the state presented no physical evidence (guns, clothing, or plastic bags

used in robberies) linking Belcher to the robberies.  Dkt. # 41, at 32-35.  For two reasons, the Court

rejects this argument.

First, to the extent Belcher contends that the testimony from Wesson and Gix had to be corroborated by other evidence, the Court agrees with respondent that this raises only an issue of state law and provides no basis for federal habeas relief.  Dkt. # 51, at 13; see Foster v. Ward, 182 F.3d 1177, 1193 (10th Cir. 1999) ("Even though [the petitioner] cites us to Oklahoma law requiring the corroboration of accomplice testimony, our habeas review is governed by federal constitutional principles, not state law.").  As the OCCA explained, "[u]nder Oklahoma law, a conviction cannot rest upon the testimony of an accomplice unless the accomplice's testimony is corroborated by other evidence that tends to connect the defendant with the commission of the offense."  Dkt. # 28-3, at 2 (quoting Postelle, 267 P.3d at 126, and citing OKLA. STAT. tit. 22 § 742).  Unlike Oklahoma law, however, "[f]ederal law does not require independent corroboration of accomplice testimony."  Watson v. Howard, No. 04-6074, 2005 WL 375940, at *6 (10th Cir. Feb. 17, 2005) (unpublished);[23] see Caminetti v. United States, 242 U.S. 470, 495 (1917) (rejecting an alleged jury instruction error, suggesting "that it was the better practice for courts to caution juries against too much reliance upon the testimony of accomplices, and to require corroborating testimony before giving credence to such evidence" but explaining that "there is no absolute rule of law preventing convictions on the testimony of accomplices if juries believe them");  United States v. Magallanez, 408 F.3d 672, 682 (10th Cir. 2005) ("A conviction may stand merely on the uncorroborated testimony of an accomplice.");  Scrivner v. Tansy, 68 F.3d 1234, 1239 (10th Cir. 1995) (stating that "[t]he Constitution does not prohibit convictions based primarily on accomplice testimony" and citing cases from other circuits for the proposition that state laws requiring

---

[23] The Court cites this unpublished decision, and other unpublished decisions herein, as persuasive authority.  Fed. R. App. P. 32.1(a); 10th Cir. R. 32.1(A).

independent corroboration of accomplice testimony "do not implicate constitutional concerns that can be addressed on habeas review"). Rather,

> [d]ue process concerns are met by "vigorous cross-examination [of the accomplice] and instructions informing juries of their responsibilities to make credibility determinations, bearing in mind the potential for bias, interest or prejudice." Watson v. Howard, 123 Fed. App'x 910, 917 (10th Cir. 2005) (citing Foster, 182 F.3d at 1193). With such safeguards, jurors are free to accept accomplice testimony "so long as the testimony is not incredible on its face and is otherwise capable of establishing guilt beyond a reasonable doubt." Foster, 182 F.3d at 1193.

Carter v. Crow, No. 16-CV-0675-CVE-PJC, 2019 WL 7373033, at *3 (N.D. Okla. Dec. 31, 2019) (unpublished).

Second, to the extent Belcher contends that the OCCA unreasonably applied Jackson, the record does not support that contention. As previously discussed, Johnson clearly delineates the roles of the jury, the appellate court, and the federal habeas court. The jury determines the weight and credibility of the evidence; the appellate court views the evidence in the light most favorable to the state and upholds a jury's guilty verdict unless "no rational trier of fact could have agreed with the jury"; and the federal habeas court defers to the state appellate court's decision so long as the state appellate court applied the Jackson standard to the facts of the case in an objectively reasonable manner. Johnson, 566 U.S. at 651. The record demonstrates that three of the four robberies were captured on surveillance videos. Dkt. # 30 (State's Exs. 1, 2, 3). The jury watched those videos; heard testimony from Wesson and Gix describing the robberies with details that were consistent with each other's testimony, the events depicted in the videos, and the events described by employees from each store; heard testimony from Wesson and Gix that the men met up at the Worthington apartments to split the proceeds after three of the robberies, sometimes divvying up the money in Goree's apartment; heard testimony from Goree that she knew all four defendants and that all four defendants would "hang out" at her apartment or in the parking lot during the same time frame as the robberies; and heard Belcher's statements (admitted through Detective

33

Ryden's testimony) admitting that he knew Carter, Wesson, and Gix, that he drove a gray Trailblazer—the same vehicle described by Wesson and Gix as one the men used in some of the robberies, and admitting that he was in the Trailblazer with Wesson and Carter one or two days after the fourth robbery. See supra, section I.B. The jury also heard evidence that law enforcement officers found no evidence at Belcher's house or in his Trailblazer that would link him to the robberies; that Belcher denied involvement in any robberies during his interview with Ryden; and that Belcher developed a limp after being hospitalized for a car accident that occurred sometime before the robberies, occasionally used an orthopedic boot, and was on crutches and wearing a cast when he was arrested in August 2014. See supra, section I.B.5. The jury weighed this evidence and, through its verdicts, found beyond a reasonable doubt that Belcher participated in each of the four robberies.

More to Belcher's primary point, the jury had ample evidence before it to assess the credibility of Wesson and Gix. Wesson and Gix were clearly identified at trial as accomplices; both men testified that they initially lied to Detective Ryden by denying their involvement in the robberies; both men testified that they participated in all four robberies and identified themselves in still photos taken from surveillance videos of the Dollar General robberies; and, according to the prosecutor's closing argument, both men testified in jail clothing and shackles. See supra, sections I.A., I.B.; Dkt. # 29-6, Tr. Trial vol. 5, at 683. Wesson also testified that he had a prior felony conviction for second degree burglary and that he had served time in prison. Dkt. # 29-4, Tr. Trial vol. 3, at 160 [389]. The prosecutor and the attorneys representing Belcher and Carter questioned Wesson and Gix at length regarding their involvement in the crimes, their motives for testifying, and any deals or benefits they hoped to receive from the state in exchange for their testimony. See generally, Dkt. # 29-4, Tr. Trial vol. 3, at 131-225 [360-454] (Wesson testimony);

Dkt. # 29-5, Tr. Trial vol. 4, at 4-108 [460-564] (Gix testimony).  The attorneys representing Belcher and Carter also vigorously cross-examined Detective Ryden about his investigation, about other possible robbery suspects, about his interviews with Wesson and Gix and inconsistencies between their interview statements and their trial testimony, and about the lack of any physical evidence connecting Belcher and Carter to any robberies.  Dkt. # 29-5, Tr. Trial vol. 4, at 159-91 [615-47].  The state court gave detailed jury instructions on impeachment evidence, credibility determinations, and the accomplice corroboration rule.  Dkt. # 29-11, O.R. vol. 2, at 23-26 [190-93], 35-42 [202-09].  Two of those instructions expressly identified Wesson and Gix as accomplices to the crimes, and one instruction advised jurors that "[i]f the testimony of an accomplice is [sufficiently] corroborated, [the jurors] shall give [the accomplice's] testimony such weight and credit as [the jurors] find it is entitled to receive."  Id. at 38-40 [205-07].  Ultimately, as evidenced by its verdicts, the jury found the testimony by Wesson and Gix sufficiently corroborated, gave it the weight and credit the jury deemed it was entitled to receive, and found the evidence, as a whole, sufficient to demonstrate Belcher's guilt beyond a reasonable doubt.

Having carefully reviewed the trial transcripts and trial exhibits, the Court concludes that it was objectively reasonable for the OCCA to determine, "after viewing the evidence in the light most favorable to the prosecution, [that] any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."  Jackson, 443 U.S. at 319.  Section 2254(d) thus bars relief, and the Court denies the petition as to claim two.

### C.    Claims three, four, five and six:  Brady, Napue, and right to counsel

In his remaining constitutional claims, Belcher alleges that the prosecutor committed a Brady violation by withholding evidence of leniency deals the state made with Wesson and Gix (claim three), Dkt. # 41, at 35-42; that the prosecutor committed a Napue violation by sponsoring

Wesson's and Gix's false testimony denying that they had leniency deals with the state (claim four), Dkt. # 41, at 42-44; that trial counsel provided constitutionally deficient representation by failing to investigate and present available evidence to establish that Belcher did not commit the robberies (claim five), Dkt. # 41, at 44-56; and that appellate counsel provided constitutionally deficient representation by failing to argue that trial counsel was ineffective for not investigating and presenting evidence to establish that Belcher did not commit the robberies (claim six), Dkt. # 41, at 56-58.

### 1.    Procedural default

Respondent contends, and Belcher concedes, that Belcher procedurally defaulted these constitutional claims when he failed to perfect a timely postconviction appeal from the state district court's November 2018 order denying his first application for postconviction relief.  Dkt. # 41, at 21, 36, 43-44, 57; Dkt. # 51, at 30-37.  The Court agrees.  As previously discussed, the Court stayed this habeas proceeding for a significant time to permit Belcher to present these constitutional claims to the OCCA through state postconviction proceedings.  Belcher raised his constitutional claims in the TCDC through his first application for postconviction relief.  Dkt. # 28-4; Dkt. # 28-6, at 2-3.  The TCDC denied his sufficiency of the evidence claim as procedurally barred because the OCCA adjudicated that claim on direct appeal, and denied the four remaining claims on the merits, under the framework for assessing ineffective assistance of appellate counsel claims.  Dkt. # 28-6.  Belcher attempted to perfect a postconviction appeal but did not timely file his petition in error.  Dkt. # 28-8, at 1.  The OCCA therefore declined jurisdiction and dismissed the appeal, applying an adequate and independent state procedural rule that requires timely filing of the petition in error.  Id. (citing Rule 5.2(C)(2), Rules of the Oklahoma Court of Criminal Appeals, Title 22, Ch. 18, App. (2019)); see Brown v. Allbaugh, 678 F. App'x 638, 641-42 (10th

Cir. 2017) ("We have held that the OCCA's Rule 5.2(C)—which sets out procedural requirements for filing for post-conviction relief—is an adequate and independent state ground that precludes federal habeas review."); Duvall v. Reynolds, 139 F.3d 768, 796-97 (10th Cir. 1998) (concluding that Rule 5.2(C) is adequate and independent state procedural rule). Belcher then tried but failed to obtain leave to file an out of time postconviction appeal from the TCDC's order denying his first application for postconviction relief. See supra, section I.C. Because Belcher procedurally defaulted claims three, four, five, and six, this Court cannot review these claims unless Belcher shows that he can overcome the procedural default.

### 2.    Actual innocence gateway claim

In claim one, Belcher invokes the miscarriage of justice exception and contends that he can overcome the procedural default of claims three, four, five, and six "because newly discovered evidence establishes that [he] is factually innocent." Dkt. # 41, at 21-31. Belcher supports his actual innocence gateway claim with two categories of evidence. First, he presents medical records spanning the time from his automobile accident in September 2013 to his arrest in August 2014. Dkt. ## 44, 45, 46, 47, 48. Second, he presents five affidavits from family members and friends. Dkt. ## 41-2, 41-3, 41-4, 41-5, 41-6.

As previously noted, "when used to overcome procedural issues, 'a claim of "actual innocence" is not itself a constitutional claim, but instead a gateway through which a habeas petitioner must pass to have his otherwise barred constitutional claim considered on the merits.'" Fontenot, 4 F.4th at 1029-30 (quoting Herrera, 506 U.S. at 404). To support a tenable gateway claim, "a petitioner must show that it is more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt." Schlup v. Delo, 513 U.S. 298, 327 (1995). To make this showing, a petitioner generally must "support his allegations of constitutional error

with new reliable evidence—whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence—that was not presented at trial." Id. at 324. And the gateway should open only if the petitioner "persuades the district court that, in light of the new evidence, no juror, acting reasonably, would have voted to find him guilty beyond a reasonable doubt." Id. at 329.

### a.    Respondent's preliminary arguments

Before evaluating Belcher's actual innocence gateway claim, the Court addresses respondent's preliminary arguments against performing that evaluation. First, respondent contends that Belcher's actual innocence gateway claim is unexhausted and that this Court should not consider any evidence that he presents to support his gateway claim. Dkt. # 51, at 41-46. Citing § 2254(b), respondent argues that "[p]etitioner cannot obtain habeas relief on a claim that has not been exhausted in state court" and "the fact that [p]etitioner raises a claim of actual innocence does not command a different result." Id. at 41, 44. To support this position, respondent cites three, out-of-circuit, unpublished decisions. Id. at 44-46. Respondent's argument, however, misunderstands the nature of an actual innocence gateway claim. "A distinction exists between claims of actual innocence used as a gateway and as a freestanding basis for habeas relief. As a gateway, a claim of actual innocence 'enable[s] habeas petitioners to overcome a procedural bar' in order to assert distinct claims for constitutional violations." Farrar v. Raemisch, 924 F.3d 1126, 1130 (10th Cir. 2019) (alteration in original) (quoting McQuiggin v. Perkins, 569 U.S. 383, 386 (2013)). But "[b]ecause gateway claims are 'procedural, rather than substantive,' they do not 'provide a basis for relief.'" Id. (quoting Schlup, 513 U.S. at 314-15). Thus, an actual innocence gateway claim is akin to a claim that is asserted to establish cause for a procedural default and

show resulting prejudice.  As the Tenth Circuit recently explained in <u>Fontenot</u>, in rejecting a similar exhaustion argument, respondent's

> contention conflates federal gateways with substantive claims. "'Cause' . . . is not synonymous with 'a ground for relief.'" <u>Martinez v. Ryan</u>, 566 U.S. 1, 17, 132 S. Ct. 1309, 182 L. Ed. 2d 272 (2012) (quoting 28 U.S.C. § 2254(i)).  That is, "[a] finding of cause and prejudice does not entitle the prisoner to habeas relief," but "merely allows a federal court to consider the merits of a claim that otherwise would have been procedurally defaulted." <u>Id.</u>  Federal courts apply the doctrine of procedural default out of respect for state procedural rules.  <u>See</u>, <u>e.g.</u>, <u>McCleskey v. Zant</u>, 499 U.S. 467, 493, 111 S. Ct. 1454, 113 L. Ed. 2d 517 (1991).  And "[w]hether to apply procedural default doctrine out of respect for state rules is a federal question that state court decisions do not control." <u>Wood v. Milyard</u>, 721 F.3d 1190, 1194 (10th Cir. 2013).  As a result, "[t]he question whether there is cause for a procedural default does not pose any occasion for applying the exhaustion doctrine when the federal habeas court can adjudicate the question of cause—a question of federal law—without deciding an independent and unexhausted constitutional claim on the merits." <u>Murray v. Carrier</u>, 477 U.S. 478, 489 (1986).  Put another way, a petitioner's "cause" argument does not itself need to be exhausted before being presented to a federal habeas court, provided such argument does not depend on an unexhausted constitutional claim for substantive relief.  But if a petitioner's excuse for a procedural default is also a constitutional claim in its own right, <u>Murray v. Carrier</u> held that it "generally" must "be presented to the state courts as an independent claim before it may be used to establish cause." <u>Id.</u>

<u>Fontenot</u>, 4 F.4th at 1022.  Applying this reasoning here, Belcher's actual innocence gateway claim is not a constitutional claim in its own right, cannot serve as an independent basis for federal habeas relief, and thus is not subject to § 2254(b)'s exhaustion requirement.

Second, respondent contends that the evidence Belcher presents to support his actual innocence gateway claim is not "new" and that this Court should not consider that evidence.  Dkt. # 51, at 50 n.17.  As respondent candidly acknowledges, however, this position is foreclosed by <u>Fontenot</u>.  <u>Id.</u>  There, the Tenth Circuit discussed the split among circuit courts regarding the meaning of "new" evidence for purposes of the <u>Schlup</u> analysis and held "that any reliable evidence not presented to the jury . . . can be factored into [the] assessment of [a petitioner's] actual innocence gateway claim." <u>Fontenot</u>, 4 F.4th at 1031-33.  Unless and until the Supreme Court

resolves this circuit split differently than the Tenth Circuit has, <u>Fontenot</u>'s view of when evidence

is "new" governs this Court's analysis.

Third, respondent appears to equate the actual innocence gateway claim with the

sufficiency of the evidence claim that Belcher presents in claim two.  Respondent asserts:

> For the first time in his amended habeas petition, [Belcher] has attempted
> to provide this Court with evidence which he believes meets the daunting threshold
> of <u>Schlup</u> and <u>Perkins</u>.  Respectfully, [r]espondent's discussion of the sufficiency
> of the evidence above in [r]espondent's first proposition amply demonstrates that
> [Belcher] is not actually innocent of these crimes within the meaning of <u>Schlup</u> and
> <u>Perkins</u>.  Nevertheless, [r]espondent will address the evidence which [Belcher] has
> attached to his amended petition to show that it lacks merit.

Dkt. # 51, at 40.  This argument, like respondent's first, misunderstands the nature of a gateway

claim.  In adopting the standard for an actual innocence gateway claim, the <u>Schlup</u> Court explained

the distinction between actual innocence gateway claims and sufficiency of the evidence claims:

> Though the <u>Carrier</u> standard requires a substantial showing, it is by no means
> equivalent to the standard of <u>Jackson v. Virginia</u>, 443 U.S. 307, 99 S. Ct. 2781, 61
> L. Ed. 2d 560 (1979), standard [sic] that governs review of claims of insufficient
> evidence.  The <u>Jackson</u> standard, which focuses on whether any rational juror could
> have convicted, looks to whether there is sufficient evidence which, if credited,
> could support the conviction.  The <u>Jackson</u> standard thus differs in at least two
> important ways from the <u>Carrier</u> standard.  First, under <u>Jackson</u>, the assessment of
> the credibility of witnesses is generally beyond the scope of review.  In contrast,
> under the gateway standard we describe today, the newly presented evidence may
> indeed call into question the credibility of the witnesses presented at trial.  In such
> a case, the habeas court may have to make some credibility assessments.  Second,
> and more fundamentally, the focus of the inquiry is different under <u>Jackson</u> than
> under <u>Carrier</u>.  Under <u>Jackson</u>, the use of the word "could" focuses the inquiry on
> the power of the trier of fact to reach its conclusion.  Under <u>Carrier</u>, the use of the
> word "would" focuses the inquiry on the likely behavior of the trier of fact.
>
> Indeed, our adoption of the phrase "more likely than not" reflects this distinction.
> Under <u>Jackson</u>, the question whether the trier of fact has power to make a finding
> of guilt requires a binary response:  Either the trier of fact has power as a matter of
> law or it does not.  Under <u>Carrier</u>, in contrast, the habeas court must consider what
> reasonable triers of fact are likely to do.  Under this probabilistic inquiry, it makes
> sense to have a probabilistic standard such as "more likely than not."  Thus, though
> under <u>Jackson</u> the mere existence of sufficient evidence to convict would be
> determinative of petitioner's claim, that is not true under <u>Carrier</u>.

Schlup, 513 U.S. at 329-30 (footnotes omitted).  See also, House v. Bell, 547 U.S. 518, 538 (2006) ("When confronted with a challenge based on trial evidence, courts presume the jury resolved evidentiary disputes reasonably so long as sufficient evidence supports the verdict.  Because a Schlup claim involves evidence the trial jury did not have before it, the inquiry requires the federal court to assess how reasonable jurors would react to the overall, newly supplemented record.").

Having rejected respondent's preliminary arguments, the Court turns to its evaluation of Belcher's actual innocence gateway claim.

### b.    Merits

Evaluating the merits of an actual innocence gateway claim requires a federal court consider the evidence presented at trial alongside the petitioner's new evidence and make a "holistic judgment about all the evidence and its likely effect on reasonable jurors applying the reasonable-doubt standard."  House, 247 U.S. at 539 (cleaned up).  In so doing, the court "may consider how the timing of the submission and the likely credibility of the affiants bear on the probable reliability of that evidence" and may consider evidence "without regard to whether it would necessarily be admitted under rules of admissibility that would govern at trial."  Id. at 537-38 (cleaned up).  In addition, "the newly presented evidence may indeed call into question the credibility of the witnesses presented at trial" and may require the court "to make some credibility assessments."  Schlup, 513 U.S. at 330.

The Court has thoroughly considered the evidence presented at trial, see supra, sections I.A., I.B., II.B., alongside Belcher's proffered "new" evidence.  Having done so, the Court finds that no evidentiary hearing is necessary to evaluate the gateway claim.  See Schlup, 513 U.S. at 331-32 (noting that, in applying the Schlup standard, a court "must assess the probative force of the newly presented evidence in connection with the evidence of guilt adduced at trial" and has

the "ability to take testimony from the few key witnesses if it deems that course advisable"); id. at 341 (Rehnquist, C.J., dissenting) (noting that "habeas courts will be able to resolve the great majority of 'actual innocence' claims routinely without any evidentiary hearing"). To the extent Belcher's motion for hearing requests an evidentiary hearing to further develop evidence supporting his gateway claim, the Court denies the motion, in part, as to that request. Dkt. # 53.

At trial, some witnesses testified that Belcher had been in a car accident, that his injuries left him with a noticeable limp, that he occasionally used an orthopedic boot, and that he had a cast on right leg sometime around July 30 or July 31, 2014, and a second cast that had been placed on his leg following outpatient surgery on the morning of his arrest on August 7, 2014. See supra, section I.B. Through closing argument, Belcher's attorney argued, in part, that Belcher "had a bad car wreck" and "has a limp"; that no eyewitnesses described any robbery suspect as having a limp or wearing an orthopedic boot; and that the person robbing the Dollar General stores, whom Wesson and Gix identified as Belcher, could be seen in the surveillance videos "moving all over the place" rather than "gingerly walking around" to avoid putting "a lot of weight on [his] leg." Dkt. # 29-6, Tr. Trial vol. 5, at 22-23 [695-96]. Both categories of Belcher's proffered "new" evidence relate to his defense theory that he was physically incapable of committing the robberies in July 2014 due to complications arising from the right leg injury he suffered in September 2013, and that if he had committed the robberies, any eyewitness would have detected, reported to the police, and testified at trial that one robber had a distinctive limp.

### i.    Medical records

First, Belcher submits medical records spanning the time between his car accident, in September 2013, and his arrest, in August 2014. The records most distant in time from the July 2014 robberies show that Belcher suffered serious injuries in a car accident that occurred on

September 8, 2013; that he had surgery on his right leg to repair a tibia-fibula fracture and torn tendons; that he "was placed into a well-padded 3-way plaster splint"; and that he was discharged from the hospital on September 17, 2013. Dkt. # 44, at 16-19, 20. Records from a follow-up visit on September 24, 2013, indicate that Belcher was in a wheelchair. Dkt. # 46, at 12-13. Progress notes from October 2, 2013, indicate that Belcher was "healing appropriately," that his splint was removed, that he was prescribed an orthopedic boot, and that he was "instructed to be nonweightbearing." Dkt. # 44, at 12-13; Dkt. # 46, at 41-42.

On February 25, 2014, roughly five months before the July 2014 robberies, Belcher had another surgery on his right leg to remove and replace the hardware from his first surgery and to repair his patellar tendon. Dkt. # 44, at 25-27. He was discharged from the hospital two days later. Id. The postoperative notes indicate that Belcher could "continue to advance to weightbearing as tolerated." Id. During an office visit on April 9, 2014, Belcher was observed to have a slight limp and a "well-healed" surgical incision, but he reported some pain. Id. at 45-46. The notes from this visit indicate that Belcher could "continue to mobilize" and engage in "weightbearing as tolerated." Id.

Records from closer in time to the July 2014 robberies show that Belcher had an office visit on June 18, 2014, that he reported that he was "ambulatory," that he "ha[d] significant pain" and "limit[ed] mobility," and that he "is still requiring pain medications." Dkt. # 44, at 47-49. The physical exam notes from this visit indicate that Belcher had a slight limp, that his incisions were well healed, and that he had "significant scarring of the skin and subcutaneous tissue" that was limiting his mobility. See id. at 49. On July 10, 2014, four days before the Patricia's Lingerie robbery, Belcher had outpatient surgery to remove scar tissue from his previous tendon repair. Dkt. # 44, at 28-30; Dkt. # 47, at 27, 33, 42. The notes from this procedure indicate that sterile

dressing was applied, but do not mention placing Belcher's leg in a plaster splint or cast.  Dkt. # 46, at 100-01.  The notes further indicate that Belcher would "be allowed to be mobility-as-tolerated" and that he was "encouraged to continue with range of motion to prevent further scar adhesion."  Id.  On July 17, 2014, three days after the Patricia's Lingerie robbery, Belcher went to an emergency room because his surgical incision had opened.  Dkt. # 45, at 4-44; see id. at 34 (describing patient's verbatim complaint as "popped some stitches out and now it is oozing").  The attending medical provider changed Belcher's dressing and prescribed precautionary antibiotics.  Id. at 29, 40.  Notes from the emergency room visit indicate that Belcher walked to the door of the emergency room without difficulty.  Id.  On July 23, 2014, two days after the Tulsa Dollar General robbery, Belcher had an office visit to follow up on the reopening of his surgical incision that prompted his visit to the emergency room six days earlier.  Dkt. # 44, at 50-52.  The notes from this visit indicate that Belcher had a slight limp, that his sutures from the July 10 procedure were "in place," and that there was an opening of the incision "approximately 3 cm in length where the skin edges have retracted," and that Belcher "was mobilizing on his lower extremity."  Id.  The notes further indicate that Belcher's medical provider would schedule a surgery to close the incision.  Id.  On July 25, 2014, the same day as the Collinsville Dollar General robbery, Belcher had outpatient surgery to close the surgical incision.  Dkt. # 44, at 31-33; Dkt. # 47, at 12.  The notes from this procedure indicate that the previous sutures were removed, "[t]he tendon repairs appeared healthy and well-healed," that new sutures were put in place to close the surgical incision, and that sterile dressing was applied.  Dkt. # 44, at 32; Dkt. # 46, at 99.  The notes further indicate that Belcher could "continue with weightbearing as tolerated."  Id.  The notes do not mention that Belcher's leg was placed a plaster splint or cast.  Id.  Belcher's discharge instructions, dated July 25, 2014, bear the following notations regarding restrictions on his activity:  "Ok to put weight on

44

right leg," and "WBAT to right lower extremity."[24]  Dkt. # 47, at 12.  The discharge instructions do not mention a plaster splint or cast but indicate that Belcher could change or pad his dressing as needed.  Id.  It was also noted that Belcher should not drive an automobile for forty-eight hours. Id.  On August 7, 2014, the date of his arrest, Belcher had outpatient surgery on August 7, 2014, the date of his arrest, after he "presented to [the] clinic again with" the reopening of his surgical incision.  Dkt. # 46, at 96-97, 112-21; Dkt. # 47, at 2-8.  The notes from this procedure indicate that Belcher's previous sutures were removed, the incision was closed, and "[s]terile dressing was applied."  Dkt. # 46, at 97.  Belcher's discharge instructions, dated August 7, 2014, indicate that he should not get his splint wet and that he could engage in "crutch walking as desired."  Dkt. # 46, at 119.

### ii.    Affidavits

Second, Belcher submits five affidavits that he obtained from:  his mother, Lashonna Belcher ("Ms. Belcher"); the mother of his child, Tyvette Gunnels; and his friends, Ashley Jennings, Charles Roberson, and Howard Jones.  Dkt. ## 41-2, 41-3, 41-4, 41-5, 41-6.  Each affidavit was signed in 2023.  Id.

Ms. Belcher avers that Belcher had a serious car accident in September 2013 and "had several surgeries on his leg throughout late 2013 and into the spring of 2014"; that, "during his recovery" he "was confined to various types of medical equipment to get around and could not wake [sic] without a limp or assistance"; that, "during that time frame he used a walker, crutches, casts, leg braces and boots;" and, that "at one time, possibly in Jun[e] or Jul[y] 2014, [Belcher] had a procedure on his leg that left him so immobile that he had to have a porta potty in his room

---

[24] Having reviewed Belcher's medical records, the Court reads "WBAT" to indicate weight bearing as tolerated.

because he could not walk on his own to get to the toilet." Dkt. # 41-2, at 3.  She further avers that Belcher had just returned from surgery, was on crutches, and "was experiencing the effects of medication" when he was arrested and taken to jail; that she later learned that Belcher "tried to explain to the police that it was not possible for him to have participated in armed robbery because of the injury to and condition of his leg"; and that Belcher also tried to explain that "he didn't need money because he had a monetary settlement from a lawsuit regarding the accident" and "had also won a jackpot, so money was not a real concern of his at the time of the robberies." Id. at 2.  Ms. Belcher avers that Belcher's trial counsel, Beverly Atteberry, "represented [Belcher] on several occasions," including a civil suit that resulted in a settlement from which Belcher may have received around $12,000.  Id. at 3.  Ms. Belcher further avers that money was not an issue for Belcher because he "was working with Charles Roberson and Howard Jones and had a music contract out of a studio in Texas." Id.  Ms. Belcher avers that Belcher could not drive, so Roberson or Jones "would drive to Tulsa and pick up [Belcher], then take him to Texas where he would work as a DJ," and bring him back to Tulsa "when the work was done." Id.  Ms. Belcher also avers that she dated Goree's father at one time; that Belcher met Carter and Wesson through Goree and may have known Gix from school; that she does not think Belcher considered any of the three men as friends; that Goree called Ms. Belcher during the investigation and told Ms. Belcher that "her play brother," whom Ms. Belcher understood to be Wesson, "was going to blame someone else for the robberies if he had to" and "was lying about the robberies"; and that Ms. Belcher suspected Wesson would blame Belcher because Wesson did so "every time he got in trouble." Id. at 2-3.  Lastly, Ms. Belcher avers that she had a Chevy Trailblazer in 2014, "but it was broken down a lot" and she "eventually towed it to salvage when she gave up on it"; that she cannot recall Belcher "ever driving" after his car accident; that he had other people drive him around, including Gunnels,

Roberson, and Jones; and that, during the investigation, "the police showed [her] photographs of a Chevy Trailblazer leaving a Dollar General Store but said they couldn't say that was the exact vehicle used in a robbery" and that the Trailblazer in that photograph was not hers." Id. at 3-4.

Gunnels avers that she shares a child with Belcher and that she was in a long-term relationship with him from before his 2013 car accident until his 2014 arrest.  Dkt. # 41-3, at 2. She avers that she was his primary driver during that time, because "he was unable to drive due to the injuries he sustained" in the accident; that Ms. Belcher would sometimes drive Belcher around; and that she "never knew of him driving from the time of his injuries" to the time of his arrest.  Id. at 2.  Gunnels further avers that Belcher "had difficulty walking without assistance or a device"; that he was in a wheelchair when he won a jackpot at the Osage Casino; that he "was unable to walk without a limp and at "[m]any times, he wore a boot, or a cast"; and that he used crutches after "some of his medical procedures."  Id.  Gunnels believes that Belcher "had several surgeries in the summer of 2014; that he had one on the same day he was alleged to have robbed a store; and "[h]e would not have been able to get around without assistance that day."  Id. at 2-3.  Gunnell avers that Belcher had surgery on the day of his arrest and was on crutches when he went to jail. Id. at 3.  Based on her "daily observations" of Belcher, Gunnels states that "it would have been impossible for him to actively participate in an armed robbery at any time during the spring and summer of 2014."  Id.  Gunnels recalls going to Torchy's bar with Belcher several times, but she "always drove him"; that she drove Ms. Belcher's car to Belcher's "half-sister's house . . . but [Gunnels] did not know what his half-sister used the car for"; and that she and Belcher "would spend a lot of time looking for baby clothing at Walmart" and he was "excited about being a father."  Id.  Gunnels avers that Belcher traveled to Texas with friends in the music business, but those friends would "always" drive him to and from Texas.  Id.  Lastly, Gunnels avers that Belcher

"never" had a black hoodie with white stitching "because he did not like wearing hoodies"; and that she "never" saw him with a gun or heard him plan or talk about robbing anyone.  Id.

Jennings avers that she knew Belcher "quite well" between September 2013, when he had a car accident, and August 2014, when he was arrested.  Dkt. # 41-4, at 2.[25]  Jennings describes Belcher as "a nice guy who had a lot of sad things happen[] to him, specifically his severe injuries in a car wreck and getting arrested for a crime he was not capable of doing."  Id.  Jennings avers that she "never saw [Belcher] drive a car after his accident"; that "he was not able to get around without assistance, either from his girlfriend, Tyvette Gunnels, or from his mother"; that "he was also using various devices to help him walk, such as crutches, a wheelchair, or a boot of some type"; and that she "never saw him walk without a limp."  Id.  Jennings further avers that Belcher "made frequent trips to Texas to work setting up concerts and work[] on music"; that Howard Jones was the "primary driver" who transported Belcher to and from Texas; and that Charles Roberson "was familiar with [Belcher's] activities during that time and helped him get around."  Id.  Lastly, Jennings avers that "anyone who really knew [Belcher] would find it hard to believe that he would have been involved in an armed robbery"; and that "[d]uring the times [she] was with [him], [she] never saw him wear a black hoodie, nor did [she] ever see him with a gun."  Id. at 3.

Roberson avers that he was Belcher's "associate" for more than nine years and knew him in 2014, "when he worked in conjunction with KAMMB Music Group in Texas"; and that Belcher "worked as a DJ and at one time had a paying contract for music events in and around the Dallas[,]

---

[25] In 2023, Jennings identified herself as a resident of Arkansas.  Dkt. # 41-4, at 2.  It is not clear from her affidavit whether she also lived in Arkansas during the time period referenced in the affidavit.

Texas area." Dkt. # 41-5, at 2.[26]  Roberson avers that Belcher was in a car accident in 2013 and "was unable to drive himself"; that Roberson would drive Belcher "around to and from Tulsa during the spring and summer of 2014; that Belcher's mother and Gunnels would also drive Belcher around, usually in Ms. Belcher's vehicle; and that "[d]uring that time," Belcher "had several surgeries to repair the damage" from his car-accident injuries, had "ongoing difficulty getting around, was wearing a leg brace or boot or was in a cast," would have been unable to run or walk without assistance" and "always limped." Id.  Roberson further avers that Belcher "was basically a good person," "attended school," "helped his family," and "tried to be a good father." Id.  Roberson believes that Belcher "could not have committed the crimes of which he was convicted." Id.

Jones avers that he has known Belcher "for many years and knew him well in 2014 when he was arrested . . . for a crime he could not have committed." Dkt. # 41-6, at 2.  Jones avers that, at the time of the robberies, Belcher "was recovering from several surgeries because of a serious automobile accident in late 2013 in which he almost died." Id.  Jones avers that Belcher "could not drive at all" during "late 2013 and 2014" and "always needed someone to drive for him"; and that Jones was one of Belcher's "primary drivers" who drove him around Tulsa and transported him to and from Texas where Belcher "was collaborating" with Jones and Roberson "in the music industry." Id.  Jones further avers that Belcher "was always wearing a cast or boot of some kind to support his injured leg"; that Belcher "[s]ometimes" wore a cast and had to use crutches; that he never saw Belcher without a limp after his accident; and that Belcher "frequently needed assistance getting in and out of the car." Id.  Jones avers that Belcher was "a good man and father,"

---

[26] In 2023, Roberson identified himself as a resident of Texas.  Dkt. # 41-5, at 2.  It is not clear from his affidavit whether he also lived in Texas during the time period referenced in the affidavit.

a "dependable" and "diligent worker," and that, as far as Jones knows, "was not involved in criminal matters." Id. Jones avers that Belcher encouraged him to "go back to school" and the two men enrolled in Virginia College Tulsa; and that Belcher also enrolled in CLEET and completed security officer training. Id. Jones avers that it "was not possible" for Belcher to participate in armed robberies with Wesson and Gix because Jones and Belcher "did not move like that"; Belcher "did not associate with the other accused in criminal matters" and "was only indirectly connected to them by other common associates"; and "Gix and Wesson were not the people that [Belcher] normally ran with." Id.

### iii.    Analysis and conclusion

Respondent contends that Belcher "has failed to demonstrate his actual innocence" and thus cannot obtain review of his procedurally defaulted claims. Dkt. # 51, at 47. For several reasons, the Court agrees.

First, Belcher's medical records provide little, if any, support for his actual innocence gateway claim and, to some extent, cut against his assertion that he was physically incapable of walking without assistance in July 2014. Summarizing the information from those records and placing them in the context of other evidence that was presented at trial, Belcher was seriously injured in a car accident, had surgery to repair his fractured right leg and torn tendons, and was hospitalized for about nine days in September 2013; he had surgery to replace failing hardware in his leg and to repair a tendon, and was hospitalized for two days in February 2014; he was ambulatory and his surgical incision was well healed in April 2014; he had a slight limp and scar tissue limiting his mobility in June 2014; he had outpatient surgery to remove scar tissue from the prior tendon repair on July 10, 2014, four days before the Patricia's Lingerie robbery where he walked into the store with Wesson and two women and posed as a customer while Carter robbed

the store at gunpoint; he visited an emergency room on July 17, 2014, three days after the Patricia's Lingerie robbery, because his surgical incision had opened up and was oozing but walked out of the emergency room without difficulty; he drove his Trailblazer to the Little Caesar's on July 19, 2014, to drop off Carter and Cummisky who then robbed the Little Caesar's and left the store in Gix's car with Wesson and Gix; he and Carter walked into and robbed at gunpoint the Tulsa Dollar General on July 21, 2014, he primarily stood or shuffled around by the door for the duration of the three to four minute robbery, and he and Carter left the store in a vehicle that was driven by Wesson; he had an office visit for further consultation on July 23, 2014, two days after the Tulsa Dollar General robbery, to follow up on the opening of his surgical incision that prompted the July 17 emergency room visit; he had outpatient surgery to close the surgical incision on July 25, 2014, and was discharged with instructions indicating he could place weight on his leg but should not drive for forty-eight hours; he rode to Collinsville as a passenger in Gix's car on the night of July 25, 2014, he and Carter walked into and robbed at gunpoint the Collinsville Dollar General, he primarily stood near the door for the duration of the robbery, and he, Carter, Wesson, and Gix left the Collinsville store in Gix's car;[27] Belcher told Ryden he had a cast put on his leg about one

---

[27] In his reply brief, Belcher appears to suggest that a reasonable jury faced with medical records objectively proving that he had surgery under general anesthesia on July 25, 2014, more than likely would have concluded that he would not have been capable of participating in the Collinsville Dollar General robbery. Dkt. # 52, at 7-8. But his medical records show that Belcher's surgical incision opened and began oozing on July 17, that he walked out of the emergency room without difficulty, that he had an office consultation on July 23 to follow up on his emergency room visit, that he had minor outpatient surgery to close the relatively small opening of his surgical incision on July 25, that he was discharged after that procedure with instructions that it was "ok" to place weight on his leg with no indications that he was placed in a splint or a cast or in need of any assistive device. See supra, section II.B.2.b.i. The medical records do not identify what time Belcher was discharged after his minor outpatient surgery, but they do show that he was no longer under general anesthesia as of 1:05 p.m., Dkt. # 47, at 18, and other evidence presented at trial shows that the robbery occurred nearly eight hours later.

week before his arrest, possibly on July 30 or July 31, 2014;[28] and he had outpatient surgery on August 7, 2014, to close his surgical incision which had again reopened sometime between outpatient surgery and the fourth robbery on July 25, 2014, and his arrest on August 7, 2014, and he was discharged with instructions to avoid getting his splint wet.  A properly instructed jury hearing the evidence drawn from these medical records alongside the evidence presented at trial more than likely would have found that Belcher had sufficient mobility in July 2014 to participate in the four robberies in the manner described by Wesson and Gix (lookout/drop-off driver/door man/door man), that eyewitnesses may have focused on the guns that Carter and Belcher were pointing at them rather than noticing whether Belcher moved with what his medical records repeatedly described as a slight limp, and that Belcher's participation in the robberies strongly correlated with an escalation of complications to his leg injury because his surgical incision "from [his] July 10, 2014, surgery just kept re-opening during the very same time period that these robberies were occurring."  Dkt. # 51, at 49.

Second, the affidavits Belcher submitted do not advance his actual innocence gateway claim, in part, because some information in the affidavits is not "new" evidence.  Examples of information that is not "new" include Ms. Belcher's and Gunnels's statements about Belcher's surgery on August 7, 2014, the date he was arrested, and that he wore a cast, used crutches, and took medication on that date; all statements indicating that Belcher had a serious car accident, walked with a limp after his accident, and sometimes used assistive devices, including crutches and an orthopedic boot; Ms. Belcher's statements about Belcher's relationships with Goree and

---

[28] There are no medical records dated July 30 or July 31, 2014, much less any medical records indicating that Belcher was placed in a cast on either day.  As just discussed, the medical records from his July 25, 2014, suggest that a surgical dressing was applied after surgery, but there is no mention of a cast.  See supra, n.26.

his codefendants and her former relationship with Goree's father; and Ms. Belcher's statement that she had a Chevy Trailblazer in 2014. These statements do not provide new evidence because the jury heard this evidence at trial. See supra, section I.B.; see Fontenot, 4 F.4th at 1031-33 (explaining that "new" evidence is evidence that was not presented at trial).

Second, as respondent contends, a reasonably instructed jury likely would view the statements in the affidavits as biased because the affiants are family and friends, most of whom aver that it was "impossible" for Belcher to commit the robberies or that they simply cannot "believe" that he participated in the robberies. See Dkt. # 51, at 39, 51, 57; see e.g., United States v. Abel, 469 U.S. 45, 52 (1984) ("Bias is a term used in the 'common law of evidence' to describe the relationship between a party and a witness which might lead the witness to slant, unconsciously or otherwise, his testimony in favor of or against a party."); id. ("Proof of bias is almost always relevant because the jury, as finder of fact and weigher of credibility, has historically been entitled to assess all evidence which might bear on the accuracy and truth of a witness' testimony."). Relatedly, given that the affidavits are from Belcher's mother and friends, that fact that he did not obtain the affidavits until roughly nine years after the robberies lessens the credibility of the statements. See Fontenot, 4 F.4th at 1033-34 (noting that "untimeliness 'does bear on the credibility of evidence proffered to show actual innocence'" (quoting Perkins, 569 U.S. at 401); see also Herrera, 506 U.S. at 423-24 (O'Connor, J., concurring) (noting that "10 years after being convicted on [] seemingly dispositive evidence, petitioner has collected four affidavits that he claims prove his innocence"; stating that "[e]xperience has shown . . . that such affidavits are to be treated with a fair degree of skepticism"; and describing the affidavits as "suspect, produced as they were at the 11th hour with no reasonable explanation for the nearly decade-long delay").

Third, even ignoring the evidence that is not "new' and disregarding potential bias and the timing of the affidavits, many of the statements in the affidavits either contradicts Belcher's own statements that were introduced at trial through Detective Ryden or lack sufficient specificity to provide a reasonably instructed jury to have reasonable doubt about his guilt in light of the supplemented record.  For example, Ms. Belcher states that she had a Chevy Trailblazer in 2014 (which the jury heard at trial), "but it was broken down a lot" and she "eventually towed it to salvage when [she] gave up on it."  Dkt. # 41-2, at 4.  There is no indication in the 2023 affidavit as to exactly when Ms. Belcher gave up on the Trailblazer, but even accepting these statements as true, the jury would have weighed this evidence against Ryden's testimony (1) that Belcher admitted during his post-arrest interview that he was in the Trailblazer with Wesson (and Carter), one or two days after the fourth robbery on July 25, 2014; (2) that the Trailblazer was parked in front of Belcher's house when Belcher was arrested on August 7, 2014; and (3) that Ms. Belcher consented to a search of the Trailblazer on August 7, 2014.  Further, to the extent Ms. Belcher's statements about the Trailblazer's non-drivability could be understood as referring to the relevant time frame—namely, July 2014, those statements also appear inconsistent with Roberson's and Gunnels's statements that Belcher was unable to drive himself around after his 2013 car accident and that others, including Ms. Belcher, Roberson, and Gunnels, would drive Belcher around during the spring and summer of 2014, "usually in his mother's vehicle."  Dkt. # 41-5, at 2.  Other examples of nonspecific statements include the following:  Roberson's statements that, in 2014, Belcher "worked as a DJ and at one time had a paying contract for music events in and around the Dallas[,] Texas area," that Roberson would drive Belcher back and forth between Tulsa and Texas "during the spring and summer of 2014," Dkt. # 41-5, at 2;  Jennings's statements that she knew Belcher well between September 2013 and August 2014, "never saw him drive a car," saw him

"using various devices to help him walk, such as crutches, a wheelchair, or a boot of some type,"

knew Belcher "made frequent trips to Texas to work setting up concerts and work[] on music,"

and "[d]uring the times [Jennings] was with [Belcher], [she] never saw him wear a black hoodie .

. . [or] with a gun," Dkt. # 41-4, at 2-3; Gunnels's statements that she "never knew of [Belcher]

driving" between September 2013 and his arrest, that "[m]any times, he wore a boot, or a cast,"

that "[a]fter some of his medical procedures, he was on crutches," that "[s]ometimes [Belcher] and

[Gunnels] would spend a lot of time looking for baby clothing at Walmart," that Belcher "made

trips to Texas with friends in the music business, but they always picked him up and drove him

back from Texas," that Belcher "did not like wearing hoodies," and that she "never saw [Belcher]

with a gun" and never "heard him plan or talk about robbing anyone," Dkt. # 41-3, at 2-3; and Ms.

Belcher's and Gunnels's statements that Belcher received a settlement after his September 2013

car accident, and that he won a casino jackpot while he was in a wheelchair.  Broad statements that

events or conditions "never" or "always" occurred are rarely helpful for a jury tasked with making

findings about events that are alleged to have occurred within a specific time frame.  Further, a

jury considering Ms. Belcher's and Gunnels's statements about Belcher's casino winnings in

conjunction with his medical records likely would have found that Belcher's jackpot occurred

closer in time to his September 2013 accident because his medical records indicate that he was

using a wheelchair at the end of September 2013, that he was prescribed an orthopedic boot and

told to avoid weightbearing activities in October 2013, and that he walked without difficulty to the

door of the emergency room on July 17, 2014, after his visit to change the surgical dressing from

his July 10, 2014, outpatient surgery.  Dkt. # 46, at 12-13, 41-42; Dkt. # 44, at 12-13; Dkt. # 45, at

29, 34, 40.  In addition, Belcher's statements to Ryden indicate that he was wearing a boot "off

and on" before he received back-to-back casts at the end of July 2014 (after the last robbery) and the beginning of August 2014.

Making a holistic judgment about all the evidence, the Court finds that Belcher has not established "that, in light of new evidence, 'it is more likely than not that no reasonable juror would have found [him] guilty beyond a reasonable doubt.'" House, 547 U.S. at 536-37 (quoting Schlup, 513 U.S. at 327). The Court thus finds that Belcher has not overcome the procedural default of the constitutional claims he identifies as claims three, four, five, and six and, as a result, this Court cannot review the merits of those claims.

## III.  Conclusion

The Court concludes that 28 U.S.C. § 2254(d) bars relief as to Belcher's claim two, challenging the sufficiency of the evidence; that Belcher procedurally defaulted his remaining constitutional claims, as identified in claims three, four, five, and six; and that Belcher has not shown, through the actual innocence gateway claim he asserts in claim one, that he can overcome the procedural default of his constitutional claims. The Court therefore denies the amended petition and denies Belcher's motions for discovery and a hearing. The Court further concludes that reasonable jurists would not debate the Court's assessment of the constitutional claim asserted in claim two, or the Court's determination that the procedural default doctrine bars review of the constitutional claims asserted in claims three, four, five, and six. The Court therefore declines to issue a certificate of appealability. See 28 U.S.C. § 2253; Slack v. McDaniel, 529 U.S. 473, 484 (2000).

**IT IS THEREFORE ORDERED** that:

1. the Clerk of Court shall **note** on the record the substitution of Christe Quick, Warden, in place of Kelli Davis, Warden, as party respondent;

2.  the original petition for writ of habeas corpus (Dkt. # 1) is **declared moot**;

3.  the amended and supplemental petition for writ of habeas corpus (Dkt. # 41) is **denied**;

4.  a certificate of appealability is **denied**;

5.  the motion for discovery (Dkt. # 42) and the motion for hearing (Dkt. # 53) are **denied**;

    and

6.  a separate judgment shall be entered in this matter.

**DATED** this 29th day of January, 2025.

CLAIRE V. EAGAN
UNITED STATES DISTRICT JUDGE